KURTZ *v.* MOFFITT & Another.

IN ERROR TO THE SUPERIOR COURT OF THE CITY AND COUNTY OF
SAN FRANCISCO AND STATE OF CALIFORNIA.

MOFFITT & Another *v.* KURTZ.

IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
DISTRICT OF CALIFORNIA.

Submitted October 14, 1885.—Decided November 23, 1885.

A writ of habeas corpus is not removable from a State court into a Circuit Court of the United States under the act of March 3, 1875, ch. 137, § 2.

A police officer of a State, or a private citizen, has no authority as such, without any warrant or military order, to arrest and detain a deserter from the army of the United States.

A writ of habeas corpus was issued on April 8, 1885, by and returnable before a judge of the Superior Court of the City and County of San Francisco, in the State of California, addressed to John Moffitt and T. W. Fields, citizens of that State, upon the petition of Stephen Kurtz, a citizen of Pennsylvania, alleging that he was by them unlawfully imprisoned and restrained of his liberty, inasmuch as they had arrested him as a deserter from the army of the United States, and had no warrant or authority to arrest him, and were not officers of the United States.

Moffitt and Fields, at the time of entering their appearance in that court, filed a petition to remove the case into the Circuit Court of the United States, because the parties were citizens of different States, and because the suit involved a ques-

tion arising under the Constitution and laws of the United States, to wit, the question whether a person who is not an officer of the United States has authority to arrest a deserter from the army of the United States. The court ordered the case to be so removed.

Moffitt and Fields thereupon signed and filed in the Circuit Court the following return:

"Now come the respondents and make this their return to the writ of habeas corpus herein, and show that respondent J. Moffitt is a regular police officer of the city and county of San Francisco, and respondent T. W. Fields is a special police officer of said city and county; and being such officers as aforesaid, they arrested the petitioner, Stephen Kurtz, in the city and county of San Francisco, by the authority of the United States in this, to wit, that said Stephen Kurtz, under the name of Stephen Noll, on the 29th day of May, 1876, at Cleveland in the State of Ohio, enlisted in the Army of the United States for the term of five years, and on the 17th day of March, 1879, he being a soldier attached to Co. D of the 21st Regiment of Infantry of the Army of the United States, stationed at Vancouver Barracks in the Territory of Washington, deserted from the Army of the United States; and your respondents hold said petitioner for the purpose of delivering him to the military authorities of the United States to be tried according to the laws of the United States."

The Circuit Court, upon motion and hearing, made an order remanding the case to the Superior Court of San Francisco; and Moffitt and Fields sued out a writ of error from this court to reverse that order.

After the case had been so remanded, Kurtz filed in the Superior Court of San Francisco a suggestion that the return was insufficient, and that he was entitled to be discharged, for the following reasons:

"First. It appears by said return that the defendants were not officers of the United States, but are police officers of the municipality of San Francisco, and as such they have no authority to arrest or detain the plaintiff, and as such officers they have been and are prohibited from arresting or detaining

the plaintiff as a deserter from the United States Army by a rule of the police department which was in force at the time of the arrest of the plaintiff, and still is in force, which rule was and is as follows: 'Police officers are prohibited from arresting deserters from the United States Army or Navy without a warrant.'

"Second. The desertion set up in the return is an offence against the United States, and not against the State of California, of which Commonwealth the defendants are officers, and they are therefore incompetent to arrest or detain the plaintiff.

"Third. The desertion set up in the return is barred by article 103 of section 1342 of the Revised Statutes of the United States."

The Superior Court, upon a hearing, ordered the writ of habeas corpus to be dismissed and Kurtz remanded to custody, and entered judgment accordingly; and he sued out a writ of error from this court to reverse that judgment, that court being the highest court of the State in which a decision on the merits of the case could be had. See *Robb's Case,* 64 California, 431, 433, and 111 U. S. 624, 627; *Barbier* v. *Connolly,* 113 U. S. 27.

*Mr. H. G. Sieberst* and *Mr. R. M. Swain* for Kurtz.

*Mr. Alfred Clarke* and *Mr. S. W. Sanderson* for Moffitt & Another.

I. The Superior Court of San Francisco had no jurisdiction to proceed with the hearing of the case on the merits, after the case was removed to the Circuit Court. The case was as clearly one involving a right under a law of the United States as was *Gordon* v. *Longest,* 16 Pet. 97. The writ of habeas corpus authorized by § 14 of the Judiciary Act of 1789, 1 Stat. 81–82, reaches every case of unlawful imprisonment under Federal authority, and every case of imprisonment in contempt of the national authority. See *Sturges* v. *Crowningshield,* 4 Wheat. 122; *Houston* v. *Moore,* 5 Wheat. 1, 27; *Prigg* v.

*Pennsylvania*, 16 Pet. 531, 614; *Ableman* v. *Booth*, 21 How. 506, 523; *Tarble's Case*, 13 Wall. 397. The State writ reaches all cases not reached by the national writ—the latter all cases not reached by the former—and thus there is no hiatus or confusion. *United States* v. *Cruikshank*, 92 U. S. 542. As State courts were more numerous than Federal courts, and reflected local political opinion, a gradual encroachment on the sphere of Federal jurisdiction may be traced, which culminated in the Supreme Court of Wisconsin declaring an act of Congress to be unconstitutional. The decision in *Ableman* v. *Booth*, above cited, settled that in all matters in which the Federal government has exclusive control, the State shall abstain from interference, as the Federal government abstains from interference with the government of the States. The conflict of jurisdiction which resulted from this encroachment may be traced through the following leading cases. *In the matter of Samuel Stacy*, 10 Johns. 328; *Ex parte Booth*, 3 Wisc. 145; *In re Tarble*, 25 Wisc. 390; *Casey's Case*, reviewed in *Neill's Case*, 8 Blatchford, 156, 164. There is a line of decisions contrary to the above, which may be traced from 1807 to the present time, as follows: 1807, *State* v. *Plime*, T. U. P. Charton, 142; 1809, *In re Roberts*, 2 Hall's Law Jour. 192; 1812, *In re Ferguson*, 9 Johns. 239; 1816, *In re Rhodes*, 2 Wheel. Cr. Cas. 567; 1819, *Wright* v. *Deacon*, 5 S. & R. 64; 1839, *State* v. *McBride*, Rice, 400; 1850, *Norris* v. *Newton*, 5 McLean, 92; 1851, *Charge by Judge Nelson*, 1 Blatchford, 635; 1851, *Thomas Sims' Case*, 7 Cush. 285; 1852, *Moore* v. *Illinois*, 14 How. 13; 1853, *In re Jenkins*, 2 Wall. Jr. 521; 1856, *In re Robinson*, 1 Bond, 39, 44; 1856, *In re Sifford*, 5 Am. Law Reg. 659; 1858, *Ableman* v. *Booth*, above cited; 1861, *Re Kelley*, 37 Ala. 474; 1861, *Re McDonald*, 9 Am. Law Reg. 661; 1862, *State* v. *Zulich*, 5 Dutcher, 409, 413; 1863, *In re Spangler*, 11 Mich. 298, 305; 1863, *In re Shirk*, 3 Grant Cas. 460; 1867, *In re Farrand*, 1 Abbott U. S. 142; 1867, *United States* v. *Jailor*, 2 Abbott U. S. 279; 1869, *In re Hill*, 5 Nev. 154; 1871, *In re Neill*, 8 Blatchford, 164; 1872, *Tarble's Case*, cited above. The latter line of decisions drown the first line so completely that the first are only interesting as relics of the past. But the

same causes which produced the first line of decisions are still operative, and produce irritation and confusion.

It is contended on the other side that a municipal policeman cannot exercise Federal power; that all his acts are done in his character as a State officer. This proposition is not sustained by the following decisions of this court. *Prigg* v. *Pennsylvania*, 16 Pet. on page 614 *et seq.*; *Tennessee* v. *Davis*, 100 U. S. on page 263; *Ex parte Virginia*, 100 U. S. on page 346; *Ex parte Yarbrough*, 110 U. S. on page 662. See also *In re Smith*, and *In re Spangler*, above cited. Many statutes authorize both Federal and State officers to perform acts outside of the duties pertaining to their offices. Rev. Stat. §§ 1014, 1750, 1758, 1778, 2165, 2181, 3066, 3833, 4522, 4546, 4556, 4559, 4606, 5270, 5280. *Ex parte Clodomiro Cota*, 110 U. S. 385, is also instructive on this point.

The Federal government still possesses all the jurisdiction which can be exercised by *habeas corpus* in any case arising under " this constitution, the laws of the United States, and the treaties made, or which shall be made under their authority." None of this power has been restored to the State judiciary by any act of Congress, and if it had been it would still be Federal power though exercised for the time being by a State officer. We have shown that many State courts failed to regard the proper limitations of State and Federal power in the use of the writ of *habeas corpus*, but we refer to the following leading cases, all cited above, to show that some of the State courts have been sound on this question: *State* v. *McBride*; *In re Sims*; *Re Spangler*. We claim that the jurisdiction which the State has surrendered, and parted with, and transferred to the United States, and which Congress has conferred on the Circuit and District Courts of the United States is not retained and cannot be exercised by the State courts. " No court can exercise judicial power unless it is derived from some government or sovereignty." *Ableman* v. *Booth*, cited above. The Superior Court had no power or authority under the Constitution and laws of California, to hear this case after the removal thereof to the Circuit Court. The Federal laws gave the Superior Court no power to hear it after the removal. The case was

one which belonged to the Federal judiciary and which did not belong to the State judiciary, and the Superior Court should have dismissed the case as moved by the defendants.

II. As to the judgment remanding the prisoner. (1) Desertion is a crime against the United States, 2 Stat. 136, 302; Rev. Stat. § 1342, Art. 47, and may be punished by imprisonment with hard labor, which may extend to life. (2) The plea of the statute of limitations under the articles of war or the penal code cannot be received on *habeas corpus*. *In re Arno White*, 9 Sawyer, 49, 52; *Ex parte Reed*, 100 U. S. 13. (3) The defendants had the right to arrest the plaintiff. They were citizens of the United States; as such, parties to the Constitution, *Dred Scott* v. *Sandford*, 19 How. on page 404; and bound to observe its laws. Those laws forbid desertion, and offer rewards for the arrest of deserters. Rev. Stat. § 1120. Every citizen has a right to accept this offer, and becomes thereby the agent of the Federal government, with authority to use force to execute the supreme law. *Ex parte Siebold*, 100 U. S. 371, 395; *Ex parte Yarbrough*, 110 U. S. 651, 662. (4) Desertion is continuous, and is an infamous crime. Congress has given a legislative definition of crimes, "not capital or otherwise infamous," in Rev. Stat. Dist. Col. § 1049, "that is to say" "all simple assaults and batteries and all other misdemeanors not punishable by imprisonment in the penitentiary." This court has construed this language in *Ex parte Wilson*, 114 U. S. 417. It has already been shown what the punishment for desertion may be. (5) No special warrant was necessary for the arrest of the deserter. A warrant in law exists when a statute authorizes the doing of an act. Under Rev. Stat. § 1014, for any crime against the United States, the offender may be arrested by any "magistrate according to the usual mode of process in such State," and § 836, Penal Code of California, prescribes that, in case of felony, or when the offender is arrested in the act, a special warrant is unnecessary, the statute being the warrant. Under the Fifth Amendment to the Constitution crimes are infamous or not infamous, or as designated in §§ 16, 17, Penal Code, felonies and misdemeanors. Desertion has none of the indicia of a misdemeanor, but has

all the features of a felony, and we are authorized to apply to it the felony procedure which justifies an arrest without a special warrant in cases where the statute is the warrant. On this question, the State is not and cannot be neutral. The deserter is not a citizen, and the State can give him no asylum. The crime he has committed is not against a foreign government, but against a sovereignty whose dominion extends to every foot of territory which any State can claim. All State officers, under article 20, § 3, Constitution of California, are enlisted on the side of the Federal government. The defendants not only had the power, but it was highly proper for them, to make this arrest. *In re Lafonte*, 2 Rob. La. 498. In arresting a deserter the power and authority of the State is not exercised. The State legislature could not prohibit or punish the arrest of a deserter from the United States army, because any such law would interfere with the powers of the national government. The rule of the police department is of no more force than if it were an act of the legislature, and as an act of the legislature it would be unconstitutional, being contrary to the supreme law of the land. *Tape* v. *Hurley*, 5 West Coast Reporter, 692.

Desiring to present all that may aid the court in the solution of the question, we also refer to the following State decisions: (1852). *Hutchings* v. *Van Bokkelen*, 34 Maine, 126. The action was replevin for the person. The deserter was remanded, and it was held that no special warrant was required for the arrest of a deserter. (1863.) *Trask* v. *Payne*, 43 Barb. 569. The action was for damages which were given against a deputy sheriff. This case is cited by the plaintiff. We remark that the order of July 31, 1862, cited in that case, has been superseded by the act of Congress of March 3, 1863, § 7 of which made it "the duty of the provost marshals to arrest all deserters and send them to the nearest military post." The same act (§ 26) authorized the President to issue a proclamation in regard to deserters. The President accordingly did "call on all good citizens to aid in restoring absent soldiers to their regiments." See Gen. Order 325, 1863, Army Reg. 1863, §§ 156–7; Army Reg. 1881, p. 28, § 214. (1866.) *Huber* v.

*Riley*, 53 Penn. St. 119. The action was for damages for not allowing plaintiff to vote. Defence that he was a deserter. Damages given in the sum of $1. (1869.) *Hickey* v. *Huse*, 56 Maine, 497. The action was for damages for arresting the plaintiff as a deserter. No damages given. (1869.) *State* v. *Symonds*, 57 Maine, 148, 150. Defendant was indicted for illegal voting. The State claimed that he was a deserter. Judgment reversed.

MR. JUSTICE GRAY delivered the opinion of the court. After stating the facts in the language reported above, he continued:

The first question to be considered is whether this case was rightly remanded to the State court, or should have been retained and decided in the Circuit Court of the United States, into which it had been removed on a petition filed under the act of March 3, 1875, ch. 137, § 2.

In order to justify the removal of a case from a State court into the Circuit Court under this act, it is not enough that it arises under the Constitution and laws of the United States, or that it is between citizens of different States, but it must be a "suit of a civil nature, at law or in equity, where the matter in dispute exceeds, exclusive of costs, the sum or value of five hundred dollars." 18 Stat. 470.

A writ of *habeas corpus*, sued out by one arrested for crime, is a civil suit or proceeding, brought by him to assert the civil right of personal liberty, against those who are holding him in custody as a criminal. *Ex parte Tom Tong*, 108 U. S. 556. To assist in determining whether it is, within the meaning of the act of 1875, a "suit at law or in equity where the matter in dispute exceeds the sum or value of five hundred dollars," it will be convenient to refer to the use and the interpretation of like words in earlier acts defining the jurisdiction of the national courts.

The Judiciary Act of September 24, 1789, ch. 20, § 22, authorized "final judgments and decrees in civil actions and suits in equity in a Circuit Court, where the matter in dispute exceeds the sum or value of two thousand dollars, exclusive of costs," to be revised by this court on writ of error or appeal.

1 Stat. 84. The act of April 2, 1816, ;h. 39, § 1, provided that no cause should be brought to this 'ourt by appeal or writ of error from the Circuit Court for the District of Columbia "unless the matter in dispute in such cause shall be of the value of one thousand dollars or upwards, exclusive of costs." 3 Stat. 261.

In *Lee* v. *Lee*, 8 Pet. 44, decided in 1854, a petition to the Circuit Court for the District of Columbia set forth that the petitioners were entitled to their freedom, and were held in slavery by the defendant; he pleaded that they were not entitled to their freedom as they had alleged; upon that plea issue was joined, and a verdict and judgment rendered for the defendant; and the petitioners sued out a writ of error. A preliminary objection to the jurisdiction of this court was overruled, and the judgment below considered on the merits and reversed. The ground of the decision upon the question of jurisdiction appears to have been that the single matter in dispute between the parties was the freedom or slavery of the petitioners—to the petitioners, the value of their freedom, not to be estimated in money; to the defendant, claiming to be their owner, the pecuniary value of the slaves as property, which, if he had been the plaintiff in error, might have been ascertained by affidavits. 8 Pet. 48.

In *Barry* v. *Mercein*, 5 How. 103, decided in 1847, this court dismissed for want of jurisdiction a writ of error to reverse a judgment of the Circuit Court for the Southern District of New York, refusing to grant to a father a writ of *habeas corpus* to take his child out of the custody of his wife who was living apart from him. Chief Justice Taney, in delivering the opinion, after quoting the 22d section of the Judiciary Act of 1789, said: "In order, therefore, to give us appellate power under this section, the matter in dispute must be money, or some right, the value of which in money can be estimated and ascertained." "The words of the act of Congress are plain and unambiguous. They give the right of revision in those cases only where the rights of property are concerned, and where the matter in dispute has a known and certain value, which can be proved and calculated, in the ordinary mode of

a business transaction.　There are no words in the law, which by any just interpretation can be held to extend the appellate jurisdiction beyond those limits, and authorize us to take cognizance of cases to which no test of money value can be applied. Nor indeed is this limitation upon the appellate power of this court confined to cases like the one before us.　It is the same in judgments in criminal cases, although the liberty or life of the party may depend on the decision of the Circuit Court. And since this court can exercise no appellate power unless it is conferred by act of Congress, the writ of error in this case must be dismissed."　5 How. 120, 121.

In *Pratt* v. *Fitzhugh*, 1 Black, 271, decided in 1861, this court dismissed for want of jurisdiction a writ of error to reverse a judgment of the Circuit Court for the Northern District of New York, discharging on habeas corpus persons imprisoned upon an execution issued by that court directing the marshal to levy the amount of a decree for $21,581.28 out of their goods and chattels, and, for want thereof, to arrest and keep them until the moneys were paid.　Mr. Justice Nelson, in delivering the opinion, said that the 22d section of the Judiciary Act had always been held to mean a property value; and he distinguished the case of *Holmes* v. *Jennison*, 14 Pet. 540, (which was a writ of error to reverse a judgment of the Supreme Court of Vermont on habeas corpus, remanding to custody a prisoner under a warrant of extradition from the Governor of that State,) upon the ground that it was brought up from a State court under the 25th section of the Judiciary Act, in which case no value was required.

In *DeKrafft* v. *Barney*, 2 Black, 704, decided in 1862, an appeal was taken from a decree of the Circuit Court for the District of Columbia, awarding the custody of a child to the father as against the divorced mother; and *Lee* v. *Lee*, above cited, was referred to as supporting the right of appeal.　But this court dismissed the appeal for want of jurisdiction, Chief Justice Taney saying that the case was not distinguishable from *Barry* v. *Mercein*, above cited, and in that case it was held "that in order to give this court jurisdiction under the 22d section of the Judiciary Act of 1789, the matter in dispute must

be money, or some right, the value of which could be calculated and ascertained in money."

The act of February 5, 1867, ch. 28, § 1, conferring power upon the judges of the national courts to issue writs of habeas corpus in cases of persons restrained of their liberty in violation of the Constitution, or of any treaty or law of the United States, expressly gave an appeal to this court from the judgment of a Circuit Court in such cases. 14 Stat. 385. Shortly after the passage of this act, Mr. Justice Nelson refused to allow an appeal from a judgment of the Circuit Court for the Southern District of New York upon a writ of habeas corpus issued under the 14th section of the Judiciary Act of 1789, because no appeal was provided by law in the case of a habeas corpus issued under that act, and the appeal given by the act of 1867 was confined to cases begun under it. *In re Heinrich*, 5 Blatchford, 414, 427. And within two years afterwards it was determined by this court that, independently of the act of 1867 (which was repealed by the act of March 27, 1868, ch. 34, 15 Stat. 44,) this court (except in a small class of cases of commitments for acts done or omitted under alleged authority of a foreign government, as to which provision was made by the act of August 29, 1842, ch. 257, 5 Stat. 539,) had no jurisdiction by direct appeal to revise the judgments of inferior courts in cases of habeas corpus, but could only do so by itself issuing writs of habeas corpus and certiorari under the general powers conferred by the Judiciary Act of 1789. *Ex parte McCardle*, 6 Wall. 318, and 7 Wall. 506; *Ex parte Yerger*, 8 Wall. 85. See also *Ex parte Royall*, 112 U. S. 181; *Wales* v. *Whitney*, 114 U. S. 564.

Section 1909 of the Revised Statutes, substantially re-enacting provisions of earlier acts, and providing that writs of error and appeals from the final decisions of the Supreme Courts of certain Territories shall be allowed to this court in the same manner and under the same regulations as from the Circuit Courts of the United States, "where the value of the property or the amount in controversy exceeds one thousand dollars, except that a writ of error or appeal shall be allowed" to this court from the decisions of the courts or judges of the Territory

"upon writs of habeas corpus involving the question of personal freedom," clearly implies that writs of habeas corpus would not be included if not specially mentioned. See also *Potts* v. *Chumasero*, 92 U. S. 358; *Elgin* v. *Marshall*, 106 U. S. 578, 580; Curtis on U. S. Courts, 65.

From this review of the statutes and decisions, the conclusion is inevitable that a jurisdiction, conferred by Congress upon any court of the United States, of suits at law or in equity in which the matter in dispute exceeds the sum or value of a certain number of dollars, includes no case in which the right of neither party is capable of being valued in money; and therefore that writs of habeas corpus are not removable from a State court into a Circuit Court of the United States under the act of March 3, 1875, ch. 137, § 2, and this case was rightly remanded to the State court.

We are then brought to a consideration of the merits of the case, as presented by the writ of error sued out by the prisoner to reverse the judgment of the State court, remanding him to custody.

The case, as shown by the record, is briefly this: Kurtz, a deserter from the army of the United States, was, without any warrant or express authority, arrested by Moffitt and Fields, police officers of the city of San Francisco, and citizens of the State of California and of the United States, and held by them for the purpose of being delivered to the military authorities of the United States to be tried according to the laws of the United States; and he claims immunity from being arrested for a military crime by persons not military officers of the United States and having no express authority from the United States or from such officers to arrest him.

If a police officer or a private citizen has the right, without warrant or express authority, to arrest a military deserter, the right must be derived either from some rule of the law of England which has become part of our law, or from the legislation of Congress.

By the common law of England, neither a civil officer nor a private citizen had the right without a warrant to make an arrest for a crime not committed in his presence, except in the

case of felony, and then only for the purpose of bringing the offender before a civil magistrate. 1 Hale P. C. 587–590; 2 Hale P. C. 76–81; 4 Bl. Com. 292, 293, 296; *Wright* v. *Court,* 6 D. & R. 623; *S. C.,* 4 B. & C. 596. No crime was considered a felony which did not occasion a total forfeiture of the offender's lands, or goods, or both. 4 Bl. Com. 94, 95; *Ex parte Wilson,* 114 U. S. 417, 423. And such a forfeiture did not follow upon conviction by a court martial of a crime not punishable by the courts of common law. Co. Lit. 391 *a.*; 1 Clode's Military Forces of the Crown, 176.

By some early English statutes, which appear to have been in force down to the Revolution of 1688, desertion was made felony, punishable in the civil courts. 3 Inst. 86, 87; 1 Hale P. C. 671–680; *The King* v. *Beal,* 3 Mod. 124; *S. C. nom. The King* v. *Dale,* 2 Shower, 511; 12 Howell's State Trials, 262, note; 4 Bl. Com. 102; *Tyler* v. *Pomeroy,* 8 Allen, 480, 487–490. But those statutes fell into disuse after Parliament by the Mutiny Acts, beginning with the statute of 1 W. & M., ch. 5, and re-enacted almost every year since, for the first time authorized mutiny and desertion to be punished at the sentence of a court martial in time of peace. Lord Hardwicke, in 14 Parl. Hist. 453; 1 Clode's Military Forces of the Crown, 19, 55, 56, 143, 154.

From 1708, the English Mutiny Acts have repeatedly, if not uniformly, contained provisions by which persons reasonably suspected of being deserters might be apprehended by a constable, and taken before a justice of the peace, and the fact of their desertion established to his satisfaction, before their surrender to the military authorities. Stats. 7 Anne, ch. 4, § 43, and 10 Anne, ch. 13, § 42, 9 Statutes of the Realm, 58, 576; Clode on Military Law, 93, 209; Tytler on Military Law (3d Ed.) 200. By the recent acts, provision is made for their apprehension by a military officer or soldier, if a constable cannot be immediately met with; and it is at least an open question whether a man whom a military officer causes to be apprehended as a deserter and delivered to an officer of the guard, without having him brought before the civil magistrate, may not maintain an action against the officer who causes his arrest,

although he cannot sue the officer of the guard if it is the duty of the latter under the Articles of War to receive and hold all prisoners so delivered to him by a military officer. *Wolton* v. *Gavin*, 16 Q. B. 48, 81; *Wolton* v. *Freese*, 16 Q. B. 81, note.

It does not appear to have ever been the law of England that a peace officer or a private citizen could as such, and without any warrant or order either from a civil magistrate or from a military officer, lawfully arrest a deserter for the purpose of delivering him to the military authorities for trial by court martial.

In the United States, the line between civil and military jurisdiction has always been maintained. The Fifth Article of Amendment of the Constitution, which declares that "no person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury," expressly excepts "cases arising in the land or naval forces;" and leaves such cases subject to the rules for the government and regulation of those forces which, by the eighth section of the First Article of the Constitution, Congress is empowered to make. Courts martial form no part of the judicial system of the United States, and their proceedings, within the limits of their jurisdiction, cannot be controlled or revised by the civil courts. *Dynes* v. *Hoover*, 20 How. 65; *Ex parte Mason*, 105 U. S. 696; *Wales* v. *Whitney*, 114 U. S. 564. Congress has never conferred upon civil officers or magistrates or private citizens any power over offenders punishable only in a military tribunal. Section 1014 of the Revised Statutes, which provides that, "for any crime or offence against the United States, the offender may, by any justice or judge of the United States," or commissioner of a Circuit Court, or by any judge, mayor, justice of the peace or magistrate of any State where he may be found, "and agreeably to the usual mode of process against offenders in such State, and at the expense of the United States, be arrested and imprisoned, or bailed, as the case may be, for trial before such court of the United States as by law has cognizance of the offence," and that "copies of the process shall be returned as speedily as

may be into the clerk's office of such court," manifestly applies to proceedings before the civil courts only.

From the very year of the Declaration of Independence, Congress has dealt with desertion as exclusively a military crime, triable and punishable, in time of peace, as well as in time of war, by court martial only, and not by the civil tribunals; the only qualification being that since 1830 the punishment of death cannot be awarded in time of peace. Articles of War of September 20, 1776, sect. 6, art. 1, 2 Journals of Congress, 347, continued in force by the act of September 29, 1789, ch. 25, § 4, 1 Stat. 96; acts of March 16, 1802, ch. 9, § 18; April 10, 1806, ch. 20, art. 20; January 11, 1812, ch. 14, § 16; January 29, 1813, ch. 16, § 12; 2 Stat. 136, 362, 673, 796; May 29, 1830, ch. 183, 4 Stat. 418; Rev. Stat. § 1342, arts. 47, 48.

The provisions of the Revised Statutes concerning the trial and punishment of deserters are as follows: By § 1342, "the armies of the United States shall be governed by the following rules and articles;" "and the convictions mentioned therein shall be understood to be convictions by court martial." By article 47, any officer or soldier who deserts the service of the United States "shall, in time of war, suffer death, or such other punishment as a court martial may direct; and in time of peace, any punishment, excepting death, which a court martial may direct;" and by article 48, every soldier who deserts "shall be tried by a court martial and punished, although the time of his enlistment may have elapsed previous to his being apprehended and tried." The provisions of §§ 1996 and 1998, which re-enact the act of March 3, 1865, ch. 79, § 21, 13 Stat. 490, and subject every person deserting the military service of the United States to additional penalties, namely, forfeiture of all rights of citizenship, and disqualification to hold any office of trust or profit, can only take effect upon conviction by a court martial, as was clearly shown by Mr. Justice Strong, when a judge of the Supreme Court of Pennsylvania, in *Huber* v. *Reily*, 53 Penn. St. 112, and has been uniformly held by the civil courts as well as by the military authorities. *State* v. *Symonds*, 57 Maine, 148; *Severance*

v. *Healey*, 50 N. H. 448; *Goetcheus* v. *Matthewson*, 61 N. Y. 420; Winthrop's Digest of Judge Advocate General's Opinions, 225.

The Articles of War have likewise always provided that any officer or soldier who advises or persuades any other officer or soldier to desert the service shall be punished by court martial. Articles of War of September 20, 1776, sect. 6, art. 4; act of April 10, 1806, ch. 20, art. 23; Rev. Stat. § 1342, art. 51. Section 5455 of the Revised Statutes, which re-enacts the act of March 3, 1863, ch. 75, § 24, 12 Stat. 735, embracing the provisions of earlier statutes, and by which every person who entices or procures a soldier to desert the military service of the United States, or who aids a soldier in deserting, or knowingly harbors a soldier who has deserted, "or who refuses to give up and deliver such soldier at the demand of any officer authorized to receive him," is to be punished by fine and imprisonment, merely provides for the punishment of civilians, not subject to the Articles of War, who are accessories to the crime of desertion by a soldier, or who do any of the acts specified tending to promote his commission of that crime. It has no application to the crime of the soldier himself, and no tendency to show that he may be arrested by a private citizen without authority from a military officer. Indeed, the last clause above quoted has rather the opposite tendency.

The respondents contend that their authority to make this arrest is to be implied from the usage of offering rewards for the apprehension of deserters, which has existed from a very early date.

On May 31, 1786, the Congress of the Confederation passed the following resolve: " Resolved, That the commanding officer of any of the forces in the service of the United States shall, upon report made to him of any desertions in the troops under his orders, cause the most immediate and vigorous search to be made after the deserter or deserters, which may be conducted by a commissioned or non-commissioned officer, as the case shall require. That, if such search should prove ineffectual, the officer commanding the regiment or corps to which the deserter or deserters belonged shall insert in the nearest gazette

or newspaper an advertisement, descriptive of the deserter or deserters, and offering a reward, not exceeding ten dollars, for each deserter who shall be apprehended and secured in any of the gaols of the neighboring States. That the charges of advertising deserters, the reasonable extra expenses incurred by the person conducting the pursuit, and the reward, shall be paid by the Secretary at War, on the certificate of the commanding officer of the troops." 11 Journals of Congress, 81.

Since the adoption of the Constitution, Congress has never passed any similar resolve or statute.: and the only legislation upon the subject, that has come to our notice, is in the provision made in the annual army appropriation acts from 1844 to 1876, "for the apprehension of deserters, and the expenses incidental to their pursuit," and from 1877 to the present time, "for the apprehension, securing and delivery of deserters, and the expense incident to their pursuit." Acts of June 17, 1844, ch. 106, 5 Stat. 697; July 24, 1876, ch. 226, 19 Stat. 98; November 21, 1877, ch. 1, 20 Stat. 2; 1885, ch. 339, 23 Stat. 359. These acts clearly confer no authority upon any one, not otherwise lawfully authorized, to arrest a deserter.

For many years, the Army Regulations, promulgated by the Secretary of War under authority of the President, have generally provided, as in those of 1821 and 1841, that a certain pecuniary reward "shall be paid to any person who may apprehend and deliver a deserter" to an officer of the army; or, as in the later regulations, that a like reward "will be paid for the apprehension and delivery of a deserter to an officer of the army at the most convenient post or recruiting station." Army Regulations of 1821, art. 69, § 104; 1841, art. 30, § 123; 1857, art. 18, § 152; 1861, art. 18, § 156; 1863, art. 18, § 156, and appx. B, § 48; 1881, art. 22, § 214.

The Army Regulations derive their force from the power of the President as commander-in-chief, and are binding upon all within the sphere of his legal and constitutional authority. *United States* v. *Eliason,* 16 Pet. 291; *United States* v. *Freeman,* 3 How. 556. Whether they could, in time of peace, and without the assent of Congress, confer authority upon civil officers or private citizens to enforce the military law need not

be considered, because the regulations in question cannot be construed as undertaking to confer such authority. They do not command or authorize any civilian to arrest or detain deserters, but merely direct the payment of a reward for every deserter actually brought in, and justify the military officers in paying the reward and receiving and holding the deserter.

The President's proclamation and order of March 10, 1863, 13 Stat. 775, commanding all soldiers absent without leave to return to their regiments, on pain of being arrested and punished as deserters, and calling upon all good citizens " to aid in restoring to their regiments all soldiers absent without leave," is not now in force. It was issued in time of war, for a temporary purpose, under § 26 of the act of March 3, 1863, ch. 75, 12 Stat. 731, which has been repealed by §§ 5595 and 5596 of the Revised Statutes.

The rule of the common law, that a peace officer or a private citizen may arrest a felon without a warrant, has been generally held by the courts of the several States to be in force in cases of felony punishable by the civil tribunals. *Wakely* v. *Hart*, 6 Binney, 316; *Holley* v. *Mix*, 3 Wend. 350; *Rohan* v. *Sawin*, 5 Cush. 281; *Brockway* v. *Crawford*, 3 Jones (No. Car.) 433; *Reuck* v. *McGregor*, 3 Vroom, 70; *Burns* v. *Erben*, 40 N. Y. 463; *State* v. *Holmes*, 48 N. H. 377. But that rule has never, so far as we are informed, been judicially extended to the case of an offender against the military law, punishable exclusively by court martial. In *Hutchings* v. *Van Bokkellen*, 34 Maine, 126, in which it was held that an officer of the army might lawfully arrest a deserter and hold him for trial by court martial, without a warrant, and that proof that the person making the arrest was *de facto* such an officer was sufficient, it was not even suggested that the arrest could be supported without any evidence of his military authority. And in *Trask* v. *Payne*, 43 Barb. 569, it was decided that a civil officer or private citizen could not lawfully arrest a deserter without express order or warrant.

Sections 836, 837, 849, of the Penal Code of California of 1872, affirming the authority of a peace officer, without a warrant, or a private person, to make an arrest " for a public

offence committed or attempted in his presence," as well as in cases of felony, and requiring the person arrested to be taken forthwith before a magistrate, evidently have in view civil offences only, and if they could be construed to include such offences against the United States, certainly do not include offences which are not triable and punishable except by court martial.

Upon full consideration of the question, and examination of the statutes, army regulations, and other authorities, cited in the elaborate argument for the respondents, or otherwise known to us, we are of opinion that by the existing law a peace officer or a private citizen has no authority as such, and without the order or direction of a military officer, to arrest or detain a deserter from the army of the United States. Whether it is expedient for the public welfare and the good of the army that such an authority should be conferred is a matter for the determination of Congress.

*It is therefore ordered that the judgment of the Circuit Court, remanding the case to the Superior Court of the City and County of San Francisco, be affirmed ; and that the final judgment of said Superior Court be reversed, and the case remanded to that court for further proceedings in conformity with this opinion.*