## UNITED STATES v. GROOPMAN et al.
### No. 249.

Circuit Court of Appeals, Second Circuit.

Feb. 27, 1945.

Samuel J. Siegel, of New York City (Samuel Mezansky, of New York City, on the brief), for defendants-appellants Henry Groopman and L. C. Heat Conditioning Corporation.

Louis Jay Brecher, of New York City (Freiman & Brecher and Maurice Freiman, all of New York City, on the brief), for defendant-appellant Fred Purcell.

Mario Pittoni, Asst. U. S. Atty., of Brooklyn, N. Y. (T. Vincent Quinn, U. S. Atty., and Vine H. Smith, Asst. U. S. Atty., both of Brooklyn, N. Y., on the brief), for plaintiff-appellee.

Before EVANS, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

After a lengthy trial, the three appellants herein, together with six other defendants, were convicted, under 18 U.S.C.A. § 88, of conspiring to make false statements to secure loans for the modernization of old houses under Title 1 of the Federal Housing Act and regulations issued under it, 12 U.S.C.A. § 1701 et seq., as specifically prohibited by 12 U.S.C.A. § 1731(a), as amended. Appellant Groopman, through his alter ego, appellant L. C. Heat Conditioning Corporation, of which he was president, was engaged in installing heating plants in houses, and had advertised for business in connection with federal insured modernization loans and had handled many such loans. Involved herein were six loans, as to all of which Groopman had prepared the papers, particularly those signed by the borrowers. The defendants who were convicted, but have not appealed, were John Meyers, president of John Meyers, Incorporated, a heating and plumbing supply company through whom five of the loans were made, and the five actual borrowers on the six loans. (One had obtained two loans in the names of two different corporations he controlled; another had used the name of his son.) The remaining defendant was appellant Purcell, a real estate broker who claims to have no connection with the transactions here involved, but to whom the evidence pointed, inter alia, as the owner, through controlled companies, of two of the properties for which loans were thus secured.

Title 1 of the National Housing Act, originally passed in 1934, sets up machinery for governmental insurance of loans on personal credit, not exceeding $2,500 each, where the proceeds are used in the modernization of old houses. Under the Act, the Federal Housing Administrator is authorized to insure against loss, banks and other eligible financial institutions which make loans in accordance with the prescribed regulations of the Administrator. 12 U.S.C.A. § 1703(a, b, g). The regulations here applicable called for various applications and statements from both borrower and his contractor tending to show financial responsibility to the extent of the loan on the part of the former, and completion of the work by the latter to the benefit of the premises thus improved and modernized. First required is a detailed "Credit Statement—Application," replete with warnings of the penalties for misrepresentation and quotation from the penalty section of the Act, wherein the applicant for the loan must give extensive details as to his personal and financial situation and as to the property upon which the improvement is to be made, including its purchase price, assessed value, incumbrances, and so on. One section contains a certification that the entire proceeds "will be expended on the above property

as itemized below," followed by directions for accurate description of the improvements, and the estimated cost, together with the name and address of the "Contractor, Dealer, etc.," all with a particular "Warning" that "misrepresentation of use of proceeds other than described above constitutes violation of Federal law." Then after the work is completed the borrower signs a "Borrower's Completion Certificate," certifying that "all articles and materials have been furnished and installed and the work satisfactorily completed";[1] and the contractor signs a "Dealer/Contractor/Applicator Statement," certifying to the lending institution, in consideration of the latter's acceptance of the borrower's note, that "all articles and materials contracted for have been furnished and installed and the work fully completed" and that "the Completion or Installation Certificate was signed after the articles and materials contracted for had been furnished and installed and the work fully completed." The borrower also signs an authorization of payment to the dealer/contractor and a promissory note covering the principal, interest, and bank charges; and the lender thereupon files a "loan report" with the Administrator. Later if the loans are defaulted the lender files a claim voucher with the Administrator, upon which it secures reimbursement for its loss.

In the present case five of the loans were made by the Colonial Trust Company, Kingsboro Office, in Brooklyn, while the sixth was made directly by General Electric Contracts Corporation, a supply company. In each instance Groopman made out all the forms required initially from all of the borrowers; these specified as the dealer either his corporation or both Meyers' and his. Then after the borrower had signed and before completion of the work, he delivered the five Colonial applications to Meyers, who secured the loans from the Trust Company, paid the dealer the amount of its claims, and transmitted the proceeds to the borrower or his attorney. In the case of the sixth loan the lender made payment directly to Groopman's company, which made the disbursements. The fact that payments were made directly to the borrowers is important, since it shows that the work was not actually completed as certified in each instance to the lender by both borrower and dealer. The amounts thus paid over to the borrowers varied from less than one-fifth to over two-thirds of the proceeds of the loan, but for the six here involved amounted to nearly one-half of the total proceeds of $10,843. In addition the prosecution relied on Groopman's knowledge of the falsity of other details of various credit statements referring to the financial situation of the maker; and there was clearly sufficient evidence of this from the testimony of the witnesses themselves, as well as the surrounding circumstances, including even variations in the different statements.

There was thus adequate evidence to show a violation of § 1731(a). Appellant Groopman for himself and his company attacks not only the form of the indictment and the fact that he was charged under the conspiracy statute, but also the sufficiency of the evidence and the court's charge with reference to it. His defense here is that the lenders permitted the practice of making the loans before completion of the work and that the proceeds were actually applied in each instance to improving the premises involved. In this connection he calls attention to an additional provision, found in the dealer statements here employed, whereby the dealer guaranteed "that all bills will be paid both for labor or material" and that no liens would be filed against the premises other than those which might be filed as collateral security for the payment of the note in question. And he treats the advance payments as no more than immaterial deviations from standard practice where the substantive statutory purpose of expenditures only for improvements was achieved; at the very least he suggests that the evidence negatives any intent to commit a crime. Hence he complains vigorously of the court's refusal to give his requests to charge based on these assumptions of fact and law.

The prosecution ignored the evidence upon which this defense was based, taking the position that the claimed agree-

---

[1] The forms furnished by the bank in this case varied in details of language from the form set forth in the regulations and failed to have the prominent "Notice to Borrower" against signing before the work was satisfactorily completed; but they contained the essential certification that the installation had been "fully completed as required."

ment or acquiescence of the lender in the practice could not condone a violation of the law or be binding upon the United States, which had to assume the loans when in default. But it suggests further that such evidence of application of the funds comes only from the self-serving testimony of the defendants. This point is well taken, for there is no conclusive proof of the ultimate use of the proceeds; the testimony of the government agents was only that the borrowers claimed so to have used the funds, not that the funds were so used, as defendants' briefs assert. The jury was at liberty to disbelieve the defendants' testimony, as it shows by its verdict that it did. United States v. Marino, 2 Cir., 141 F.2d 771, certiorari denied Marino v. United States, 65 S.Ct. 48; United States v. Rosenberg, 2 Cir., 145 F.2d 653, 655, certiorari denied 65 S.Ct. 553. But we think it clear that the regulations are intended to prevent just such a situation as defendants envisage. That so important a fact, as this is shown to be by the form in which the applications are cast, should be left to the oral testimony of the defaulting borrowers themselves would go far to destroy the safeguards required for the government insurance of the loans. Not only is the personal credit of the borrower important; it is equally important that a certificate of a reputable dealer show that he has actually made and satisfactorily completed the specific improvement for which the loan was applied for and made. And the very papers signed by the defendants brought this requirement to their attention unmistakably.

■■ Hence the matter relied on as defense could have no bearing other than as it might throw light on defendants' intent. Since the requests, as framed, rested on assumptions which, as we have seen, were ill founded, there was no error in the court's refusal to give them to the jury. And we think the court's instructions in general terms as to the necessity of proof of statutory intent and knowledge of the falsity of the statements were adequate and all that the defendants were entitled to under the circumstances. To compel the court to stress particularly the circumstances under which these specific jobs were carried out would be to emphasize a possible lack of felonious intent beyond what the facts brought home to the defendants by both the regulations and the forms would justify.

■■ Nor was it error for the court to hold this evidence adequate to prove a conspiracy and to deny the claim of variance between indictment and proof. All these loans, made at or near the same time, followed an identical pattern. They were solicited directly by Groopman, or by others in his behalf, as by Purcell, to whom he paid a commission on at least three occasions. In each case he worked out the details; and usually he had Meyers carry through the actual procuring of the money and its ultimate disbursement. It is really too much to say that this shows only coincidence, not planning. Indeed, the claim of the defense that the lenders condoned, if not connived at, the practices followed supports the view of a general design, rather than of chance misdeeds. United States v. Valenti, 2 Cir., 134 F.2d 362, 365, certiorari denied Valenti v. United States, 320 U.S. 809, 64 S.Ct. 29; United States v. Cohen, 2 Cir., 145 F.2d 82, 88, 89; Direct Sales Co. v. United States, 319 U.S. 703, 713, 63 S.Ct. 1265, 87 L.Ed. 1674. Of course, so far as Groopman is concerned, he benefits from a conviction of only a single offense, instead of six separate offenses, each punishable by a like period of imprisonment.

■■ The only other error assigned by Groopman and his company is as to the indictment, which is claimed to be fatally defective, on the ground—so far as we can understand him—that it is too full and complete. It referred by section number to certain parts of the Housing Act in addition to the penal section, § 1731(a), directly involved, and then went on to attempt an explanation of the regulations and of the practice to be followed in making home modernization loans. Whether this explanation was successful—indeed, whether the jury was helped by the judge's reading of this lengthy exposition at the opening of his charge—is perhaps doubtful; but that is far from saying that no conviction can be had upon it. Particularly is this so in the light of modern views of criminal procedure, where the office of the indictment is to give fair notice to the accused of the essential facts of his offense, not of the legal theory of the prosecution. United States v. Achtner, 2 Cir., 144 F.2d 49; United States v. Pape, 2 Cir., 144 F.2d 778,

certiorari denied Pape v. United States, 65 S.Ct. 86; Rules of Criminal Procedure for the District Courts of the United States (1944), Rule 7(c). Even if certain matter set forth in the indictment be considered superfluous, the defendants had more than adequate notice of the charge against them; indeed, it is difficult to discover ground for objection unless we accept the view, which has not yet achieved a foothold in law, that saying overmuch conceals equally with saying too little.

■ As to appellant Purcell, his most direct connection with the transactions at issue is through the loans made to defendants Mulligan and Roth. These were employees of his, without apparent substance in their own right; and in each case the premises involved were owned by one of his companies originally, thereupon deeded to the borrower in question at the time of the loan and after the application had been made, and then two weeks later deeded back to another company of his. Without elaborating on all the evidence, we may note that it was fully sufficient to justify the jury in concluding that Purcell was the real borrower and that the proceeds which were returned to the nominal borrowers eventually went to him. Moreover, he had other connections with Groopman and the latter's transactions. Not only did he sell two of the other properties to the respective borrowers, but in the case of one it was shown that he had sent him to Groopman for the loan and had then received either $250 or $350 of the proceeds. As to still another of the loans, there was testimony that Purcell received $30 from Groopman as a commission for referring the borrower to him. The evidence is therefore ample to connect Purcell with the conspiracy.

■ Finally objection is made to the admission in evidence of not only the 1940, but also the 1941, regulations of the Administrator, on the ground that the latter did not become effective until July 1, 1941, after the loans in question were made. This objection is without substance. We do not find, nor are we told, in what respects here important the two sets of regulations differed; further, since payment upon the notes or action in case of default would be necessary well beyond their effective date, the later regulations would seem obviously relevant. Moreover, one of the loans was not made until September, 1941.

Convictions affirmed.