### Ex parte POTENS.

No. 2932.

District Court, E. D. Wisconsin.

Dec. 18, 1945.

Max Raskin, of Milwaukee, Wis., for petitioner.

Timothy Cronin, U. S. Atty., and E. J. Koelzer, Asst. U. S. Atty., both of Milwaukee, Wis., for the United States.

DUFFY, District Judge.

This is a petition for a writ of habeas corpus. Petitioner is confined at the United States Disciplinary Barracks, Milwaukee, Wis., pursuant to a sentence of a general court martial which was held by the United States Army at Fort Sheridan, Ill. Petitioner was found guilty of absence without leave, 61st Article of War, 10 U.S. C.A. § 1533, and was sentenced, after modification by the Board of Review, to dishonorable discharge and confinement for three years in a disciplinary barracks.

Asserting that he never was inducted into the military service, petitioner claims his conviction by the Army court martial was unlawful and that no basis in law exists for his present confinement.

The return to the writ consists in part of the voluminous record of the court martial together with subsequent administrative proceedings. Petitioner made no answer or traverse to the return. In the absence of traverse, the return is conclusive. Adams v. Hudspeth, 10 Cir., 121 F. 2d 270. Where a petitioner does not answer or traverse the return, the sole question presented is whether the return constitutes justification in law for petitioner's detention. United States ex rel. Laird v. O'Brien, 7 Cir., 111 F.2d 232, 234.

The following outline presents a summary of the pertinent facts disclosed by the return:

On July 28, 1942, Wayne County Local Draft Board No. 24 of Detroit, Mich., classified the petitioner as 3-B, covering

a person who had dependents and was essentially engaged in national defense work. On October 27, 1942, the board reclassified petitioner, placing him in Class 1–A. On January 16, 1943, Major Arthur A. Holmes, Classification Division, Michigan State Selective Service Headquarters, instructed the draft board to "stay" the induction of petitioner. The board complied. On March 13, 1943, the draft board wrote Major Holmes for advice about "the situation." Pursuant to a reply from Major Holmes dated April 9, 1943, and instructions contained in a letter dated April 9, 1943, from Colonel C. E. Strong, Internal Security Officer, Central Procurement District, Army Air Forces, Detroit, Mich., the board ordered the petitioner to appear for induction at the induction center, Detroit, Mich., on May 20, 1943.

The petitioner appeared at the induction center at the designated time and his name appears on the draft board's Form 151, known as the "delivery list," which contained the names of the men ordered by the board to report to the induction center on the day in question. On that day Major Edward L. Watson and Lt. Aristomenis Mantzoros were on duty at the induction center. These officers, according to their testimony, had no affirmative recollection as to the induction of the petitioner. Their testimony covered the routine procedure in the matter of induction followed on that day which disclosed nothing to indicate that there had been a failure of induction in the case of any selectee who had been ordered to appear for induction.

Upon the arrival of the selectees at the induction center, according to the procedure followed, there was a roll call of the men whose names appeared on the delivery list, followed by an orientation talk explaining the induction procedure. Thereafter the men were called up to the reception desk individually by name, and entered the line for induction. At the reception desk each man was handed his individual report, Form 221, entitled "Report of Physical Examination and Induction." This form originated with the draft board, and sections I and II of the form, dealing respectively with biographical data and the report of the physical examination by the draft board's physician, were filled out by the draft board prior to the induction process. The Form 221 for petitioner was identified and introduced in evidence at the court martial. After the selectee had received his Form 221, a clerk at the reception desk asked him whether he was under arrest awaiting criminal charges or on probation or parole, whether he had ever served "time" in a penal institution, whether he had ever been dishonorably discharged from the military service, and a series of similar questions. If he replied in the affirmative to any of these questions he was sent to interview Captain Yowel, whose office was on the second floor and whose primary duty was "handling administrative rejects for moral standards."

If it appeared that the selectee had served "time" in a penal institution or had been dishonorably discharged, etc., Captain Yowel "made an administrative reject" of him. Otherwise Captain Yowel sent him back to the first floor to continue the induction routine. After the selectee left the reception desk, a number was painted on his hand, entered on a roster, and marked in pencil upon his Form 221. The petitioner's Form 221 shows that his identification number was 379.

After checking part of his clothing and taking literary tests in the classification and assignment section, the selectee went from the first floor to the third floor for his physical examination. The physical examination was never given at any place outside the induction center. The petitioner's Form 221 shows that he received the physical examination and was found physically and mentally qualified for general military service.

The selectee then proceeded to the assignment desk for assignment to one of the branches of the service. If assigned to the Army he went down to the second floor and was fingerprinted. Immediately thereafter he submitted to a clerk information concerning the relative to be notified in case of emergency and the designation of a beneficiary, these being matters required for the completion of section III of Form 221. The clerk typed the data on the form, whereupon the selectee placed his signature at the bottom of section III and the signature was witnessed by an induction officer. The answers to the questions contained in section III of the form were never filled in at a place other than the induction center, nor for men who were rejected. The signature of petitioner appears at the bottom of section III of his Form 221, followed by the signature of Lt. Mantzoros as witness. The petitioner's signature was identified.

After the selectee signed section III of Form 221, an Army serial number was assigned to him and his service record prepared. A photostat copy of the petitioner's service record was received in evidence signed by Lt. Mantzoros and reciting petitioner as having been inducted into the Army on May 20, 1943. His service record was prepared before the administration of the oath.

The preparation of special orders followed, containing the names of the men accepted and inducted on that date. The special orders for May 20, 1942, were in evidence and the name and serial number of the petitioner appear thereon. Any errors on the special orders for May 20 would be shown by entry of correction on the special orders of May 21. No entry concerning petitioner appears on the special orders for the latter day. The induction center also kept separate daily records of rejections. The name of petitioner does not appear on such records for either of the two last mentioned dates.

On Form 151, the draft board's delivery list previously referred to, the petitioner's name is checked as having been accepted for the Army and no notation appears that he was held over. Each selectee was given an extract copy of the special orders referred to, which included his name and serial number, upon receipt of which he would arrange with the transportation officer for transportation to Fort Custer.

Thereafter, in the room where the oath was administered, each man was called up according to the names listed on the special orders. If any selectee did not answer, "Here," and could not be located, his name was stricken from the special orders, which would be amended on the following day to show the fact of his absence. As previously noted, the petitioner's name appears on the special orders of May 20, 1943, and no amendment or correction concerning him appears on the special orders for the following day.

Before administering of the oath the selectees received another orientation talk during the course of which they were instructed to report to the Recruit Reception Center, Fort Custer, Mich., on May 27, 1943. The special orders of May 20, 1943, also directed the selectees, including petitioner, to report accordingly.

In the orientation talk the men were told that anyone not wishing to take the oath should step aside. No one refused to take the oath on that day. The oath was administered by Lt. Mantzoros, who testified that the oath must have been administered to the petitioner for otherwise he would not have signed his service record and Form 221. The latter form contains a notation, signed by Lt. Mantzoros, that on that day petitioner was inducted for general military service into the Army, transferred to the enlisted reserve corps, and ordered to report on May 27, 1943, for active duty at Fort Custer. Lt. Mantzoros further testified that during the induction procedure selectees were not permitted to leave the building and that a guard was stationed at the door to see that no selectee left without proper authority. Major Watson testified to the same effect and added that lunch was provided for selectees at the induction center.

The petitioner did not report to Fort Custer on May 27, 1943, or at any other time. On December 9, 1943, upon notification from the Adjutant General that the petitioner was "wanted" by the Army, the draft board notified the military police detachment at Detroit. On March 3, 1945, the petitioner was arrested at Detroit. At the time he asked the reason for his arrest, and when told he was wanted as a deserter he replied that he could not be a deserter as he had never been inducted.

In attempting to meet the evidence above stated, the petitioner's testimony before the court martial with reference to the issue of induction and orders to report may be briefly summarized as follows:

He reported to the induction center as ordered and at that time asked for advice concerning difficulties he had experienced as a war worker. He says he was referred to Captain Yowel. In his conversation with Captain Yowel he explained his difficulties as a war worker and requested the captain to procure a stay of his induction for a day or two. After some discussion Captain Yowel told the petitioner to wait in the hall. The petitioner says that he took advantage of this opportunity and went to the Navy recruiting desk and volunteered his services to the Navy, but was rejected. Returning to Captain Yowel and further conversing with him, the petitioner says he was again asked to step outside as Captain Yowel indicated he would make further investigation. Leaving Captain Yowel, the petitioner testified that, it then being time for lunch, he left the building,

went out to lunch and never returned. In his testimony the petitioner maintained that he has never taken the oath inducting him into the Army and has never been in the presence or near presence of a person or persons taking the oath, and that he never saw the special orders of May 20, 1943, and in addition that he never received instructions to report to Fort Custer or any other military center. Allowed to testify concerning his reasons for not proceeding with his induction, the petitioner assigned his rejection by the Navy and the lack of encouragement that he had received at the hands of Captain Yowel.

On May 20, 1943, Army Regulations with respect to the induction ceremony provided as follows:

"d. Induction—Upon completion of the physical examination and after certification by medical officer, selectees found to be physically and mentally fit for general military service will be inducted.

"e. Induction ceremony—
(1) The induction will be performed by an officer who, prior to administering the oath, will give the men about to be inducted a short patriotic talk . . . The oath, Article of War 109, will then be administered: . . .

\* \* \* \*

(4) They will then be informed that they are now members of the Army of the United States and given an explanation of their obligation and privileges . . ."

(Changes 4, 30 March 1943, AR 615-500, 1 September 1942, Par. 13)

Under Art. I, Sec. 8, cl. 14, United States Constitution, Congress is vested with power "to make Rules for the Government and Regulation of the land and naval Forces." In the exercise of that power Congress enacted the statutes under which petitioner was prosecuted.

The congressional power to provide for the trial and punishment of military and naval offenses has no connection between it and the third article in the Constitution defining the judicial power of the United States. The two powers are independent of each other. Dynes v. Hoover, 20 How. 65, 15 L.Ed. 838. Courts martial form no part of the judicial system of the United States, and the proceedings therein, if confined within the limits of their jurisdiction, cannot be revised, altered, or controlled by the civil courts. Kurtz v. Moffitt, 115 U.S. 487, 6 S.Ct. 148, 29 L.Ed. 458. Where a petitioner is restrained of his liberty under court martial proceedings and petitions a civil court, the sole inquiry is whether the court martial had jurisdiction to try him. Ex parte Reed, 100 U.S. 13, 25 L.Ed. 538; Johnson v. Sayre, 158 U.S. 109, 15 S.Ct. 773, 39 L.Ed. 914; Mullan v. United States, 212 U.S. 516, 29 S.Ct. 330, 53 L.Ed. 632. Courts martial possess the same full, complete, and plenary jurisdiction over offenses committed against military law as civil courts of our country possess over controversies within their authority. Carter v. McClaughry, 183 U.S. 365, 22 S.Ct. 181, 46 L.Ed. 236, and while acting within the scope of such exclusive jurisdiction, they are supreme. Carter v. Roberts, 177 U.S. 496, page 498, 20 S.Ct. 713, 44 L.Ed. 861, holds: "Courts martial are lawful tribunals, with authority to finally determine any case over which they have jurisdiction, and their proceedings, when confirmed as provided, are not open to review by the civil tribunals, except for the purpose of ascertaining whether the military court had jurisdiction of the person and subject-matter, and whether, though having such jurisdiction, it had exceeded its powers in the sentence pronounced."

Possessing only the right to make limited inquiry relative to jurisdiction, civil courts cannot review the merits of cases tried in military tribunals. Sanford v. Robbins, 5 Cir., 115 F.2d 435, certiorari denied 312 U.S. 697, 61 S.Ct. 737, 85 L.Ed. 1132; Mosher v. Hudspeth, 10 Cir., 123 F.2d 401, certiorari denied 316 U.S. 670, 62 S.Ct. 1039, 86 L.Ed. 1745. Civil courts are not courts of error to review the proceedings and sentences of legally organized courts martial having jurisdiction of the person of the accused and of the offense. Mullan v. United States, supra. Proceedings of a military tribunal cannot be attacked for mere errors or irregularities. Schita v. Cox, 8 Cir., 139 F.2d 971, certiorari denied Schita v. Pescor, 322 U.S. 761, 64 S.Ct. 1273, 88 L.Ed. 1589. Since a civil court or jury is at liberty to disbelieve the testimony of those accused and tried before them (United States v. Groopman, 2 Cir., 147 F.2d 782, 785), a court martial necessarily has corresponding power in the trial of cases before it. Any failure of a court martial to make proper inferences or find-

ings from evidence does not go to jurisdiction and cannot be considered in habeas corpus. Romero v. Squier, 9 Cir., 133 F.2d 528.

There is no basis for the contention of petitioner's counsel that Billings v. Truesdell, 321 U.S. 542, 64 S.Ct. 737, 88 L.Ed. 917, has modified any of these settled rules. In that case it appeared without dispute that Billings not only refused to take the oath, but refused to do anything else that was required of him and immediately challenged the jurisdiction of the Army over him. On such facts the court held that under the Selective Training and Service Act of 1940, 50 U.S.C.A.Appendix, § 311, Billings was not "actually inducted" for training and service, and hence not subject to military jurisdiction. Accordingly that case, which involved no hearing before a court martial, has no application here excepting to the limited extent of indicating what constitutes induction into military service under existing statutes. On this point the court said (page 559 of 321 U.S., page 746 of 64 S.Ct., 88 L.Ed. 917): "* * * a selectee becomes 'actually inducted' within the meaning of § 11 of the Act when in obedience to the order of his board and after the Army has found him acceptable for service he undergoes whatever ceremony or requirements of admission the War Department has prescribed." In the case at bar there was evidence before the court martial on the subject of induction and the receipt of orders by the petitioner to report at Fort Custer to the effect outlined above. In Billings v. Truesdell, supra, Billings' evidence of noninduction stood as a verity.

Petitioner's counsel argues that the writ should be sustained on the basis of the petitioner's testimony before the court martial. To do so and hold that petitioner was absent when the induction ceremony took place, the court would be obliged to disregard and discredit the conflicting evidence offered on those subjects by the prosecution before the court martial. Any inquiry or examination by the court in this case cannot lawfully extend beyond ascertaining the existence of such evidentiary conflict before the court martial. The record of the proceedings before the court martial discloses that there were issues of fact before it. These, resolved adversely to the petitioner, constituted action clearly within the jurisdiction of the court martial, which action has received on review the requisite administrative approval and confirmation of the Army authorities established by law for that purpose. It was legitimately within the province of the court martial and reviewing authorities to disbelieve the petitioner's testimony and, on the other hand, to hold as credible the proofs offered by the prosecution. With such a situation, there is no jurisdictional issue to be passed upon by this court.

The writ is dismissed and the petitioner remanded. An order to this effect will be prepared by the United States Attorney.