UNITED STATES, Appellee

v.

Wesley A. MORGAN, Airman First Class
U.S. Air Force, Appellant.

No. 93–1111.
CMR No. 29431.

U.S. Court of Military Appeals.

Argued April 14, 1994.

Decided Sept. 19, 1994.

For Appellant: *Captain Del Grissom* (argued); *Lieutenant Colonel Frank J. Spinner* (on brief); *Colonel Jay L. Cohen* and *Lieutenant Colonel G. Michael Lennon, USAFR.*

For Appellee: *Lieutenant Colonel Thomas E. Schlegel* (argued); *Colonel Jeffery T. Infelise* (on brief); *Captain Timothy G. Buxton.*

*Amicus Curiae* on behalf of Appellee: *W. Jeremy Davis, James E. Haase, Alice J. Mansell*—For University of North Dakota School of Law.

## Opinion of the Court

GIERKE, Judge:

A general court-martial composed of officer members convicted appellant, contrary to his pleas, of rape, in violation of Article 120, Uniform Code of Military Justice, 10 USC § 920. The approved sentence provides for a bad-conduct discharge, confinement and partial forfeiture of pay per month for 3 months, and reduction to the lowest enlisted grade. The Court of Military Review affirmed the findings and sentence in an unpublished opinion.

We granted review * of the following issue:

WHETHER THE AIR FORCE COURT OF MILITARY REVIEW ERRED BY RULING ADMISSIBLE THE 10 DECEMBER 1990 CONFESSION OF APPELLANT AND THAT THE ACTIONS OF THE AFOSI AGENTS WERE PERMISSIBLE WITHIN THE SCOPE OF *EDWARDS V. ARIZONA,* IN CONTINUING THEIR QUESTIONING OF APPELLANT IN THE GUISE OF CLARIFYING AN AMBIGUOUS REMARK AFTER HE INVOKED HIS RIGHT TO AN ATTORNEY.

After entry of pleas, appellant moved to suppress his statements to agents of the United States Air Force Office of Special Investigations (OSI). The military judge denied the motion, and the Court of Military Review upheld the military judge's ruling. Appellant now contends that the Court of Military Review erred by holding that appellant's statements were admissible. We hold that the Court of Military Review did not err.

## Factual Background

Appellant was apprehended by OSI agents on the night of December 2, 1990, after he had been accused of raping a female, Airman G. Special Agent (SA) Flick testified that he took appellant to an interview room at the OSI office and advised him of his rights under Article 31(b), UCMJ, 10 USC § 831(b), and his right to counsel. Appellant indicated his willingness to make a statement and stated that he did not want a lawyer.

Appellant initially denied being in Airman G's dormitory room on the night of the alleged rape. He later admitted that he had been in Airman G's room and stated that they had engaged in consensual intercourse. Appellant's statement was reduced to writing, and he signed it and swore to its truth.

On December 10, 1990, the OSI requested that appellant come back to the OSI office

---

* We heard oral argument in this case at the University of North Dakota Law School, Grand Forks, North Dakota, on Thursday, April 14, 1994, without objection from the parties involved. *See* Foundation of the Federal Bar Association, *Equal Justice Under Law: The Supreme Court in American Life* 15–18 (1965); *see also* D. O'Brien, *Storm Center: The Supreme Court in American Politics* 78, 135–40 (2d ed.1990). This procedure is similar to the well-established practice of the United States Court of Appeals for the Eighth Circuit which holds hearings at various law schools within its circuit. The United States Court of Military Appeals conducts a hearing such as this outside its permanent courthouse in Washington, D.C., as part of its "Project Outreach," a public awareness project which demonstrates not only the operation of a Federal appellate court, but also the quality and effectiveness of the criminal justice system of our Armed Services and the Uniform Code of Military Justice (Arts. 1–146, 10 USC §§ 801–946, respectively). It is hoped that the thousands of students, service persons, military and civilian attorneys, and members of the American public who witness these hearings will realize that America is a democracy that can maintain an Armed Force instilled with the appropriate discipline to make it a world power and yet afford the members of that Armed Force a fair and impartial justice system which does provide the full protection of the Constitution of the United States and Federal law to its members.

for a second interview and a polygraph examination. Appellant arrived unescorted at about 9:00 a.m. SA Scroggins properly advised appellant of his rights. Appellant again waived his rights, agreed to make a statement, and consented to the polygraph examination.

At about 11:00 a.m., after the polygraph examination was completed, the agents conducted a post-polygraph interview. Appellant again told the agents that he had engaged in consensual sexual intercourse with Airman G, but he changed "how the act itself occurred and how it ended." According to SA Flick, appellant said that "toward the end of the intercourse she told him to stop, and at that point he said he stopped, where initially he says he stops right away, but the story started to change where it took a little bit longer."

Appellant wrote his version of the facts on a piece of notebook paper. SA Scroggins was absent while appellant was writing. In his handwritten statement appellant said:

> Everything I have said is true except I did leave out some information. She was under me & she was moving and would say my name. All of a sudden she said No. I went to kiss her to see if she did want me to stop. She kissed me back. When I went to kiss her again she turned her head. I put my hand on her face covering her mouth to turn it toward me. She then kissed me. So I got on my hands and started to thrust harder to cum she turned her head again & now she said no again. She put her hands up saying Don't. Then she started to push saying Quit. I was at the point of climex [sic] and I pulled out as I was cumming....
>
> * * *
>
> I DID NOT intend to frighten her. I DID NOT do it to shut her up. Or I DID NOT do it to stop her from breathing, referring to covering her mouth with my hand.

At 12:57 p.m., SA Flick orally swore appellant to the statement; but as appellant was about to sign it, SA Scroggins—who had reentered the interview room—told appellant "that he should not sign it if it was not the whole truth and if he had left anything out."

SA Scroggins testified that he told appellant that "unless that statement was completely accurate and completely the truth that he shouldn't swear falsely to it." Appellant hesitated about signing the statement, and the agents decided that further questioning was needed.

SA Flick testified that after they had questioned appellant further, appellant asked, "Can I still have a lawyer or is it too late for that?" According to the OSI interview record, appellant's question was at 2:44 p.m., about an hour and 44 minutes after appellant had completed his handwritten statement and the agents had decided that further questioning was needed. SA Flick said he did not know whether appellant was invoking his right to a lawyer or merely asking "if a lawyer was still available to him." SA Flick testified further that they "stopped all questioning" and asked appellant "if he wanted a lawyer." According to SA Flick:

> Well, Special Agent Scroggins, at this point, started asking him if he wished to have an attorney, if he wished to continue the interview, et cetera, and he was saying yes to all those questions, and Special Agent Scroggins was again going, I believe, by the form that he had, and all his answers to that was to the effect that he did not want a lawyer and that he did not wish to remain silent.

SA Scroggins phrased appellant's question somewhat differently. He testified that appellant asked, "If I want an attorney can I still have one, or have we progressed beyond all that?" According to SA Scroggins:

> I told him that he would never progress beyond that point, that anytime he desired legal counsel he was certainly entitled to that, that all he had to do was tell me he wanted an attorney, we would terminate the interview and make sure that he had assistance in obtaining legal counsel.

SA Flick testified further that, after SA Scroggins readvised appellant of his rights, "I then ask[ed] him the specific question, did he wish to have a lawyer present, you know, at that time," and appellant responded, "No." The agents then resumed questioning appel-

lant about the alleged rape. According to SA Flick, appellant changed his story again and admitted using force and having sexual intercourse with Airman G against her will. SA Scroggins testified that he admitted she had not invited him into her bed or suggested that they have intercourse. He admitted that she was "passed out, or unconscious" when he entered her room, that she was "at best, semiconscious" while he was in her bed, and that he covered her mouth with his hand "to keep her quiet."

At that point the agents again advised appellant of his rights by using Air Force Form 1168, Statement of Suspect, and appellant initialed the entries reflecting that he understood his rights and indicating that he did not want a lawyer, "but at the same time he started making some comments and asking [SA Flick's] opinion on whether or not he should have a lawyer." SA Flick told appellant that he could not "give him legal advice." He again asked appellant if he wanted a lawyer, and appellant answered, "Yes." At that point the interview was terminated.

On cross-examination by defense counsel, SA Flick testified that SA Scroggins told appellant that if he continued to tell his previous story, SA Scroggins would come into court and tell the court that appellant "was a liar." SA Flick also testified that SA Scroggins pointed out the punishment for rape and told appellant that "some times in rape cases the death penalty was a possibility." According to SA Flick, these exchanges occurred "well after" appellant asked if it was too late to request counsel, was readvised of his rights, and stated that he did not want counsel.

SA Scroggins testified that he told appellant at the beginning of the post-polygraph interview that "it was very obvious he had not been truthful with me." SA Scroggins did not believe that he called appellant a "liar." He testified that he "showed him" the definition of rape and the maximum punishment, using the Manual for Courts–Martial. He admitted showing appellant that the death penalty was a possible punishment for rape. SA Scroggins believed that he showed appellant the Manual for Courts–Martial be-

fore appellant's question about a lawyer, but he was unsure.

Appellant testified that he "asked if I could still have an attorney," because "I felt like their questioning and everything had gotten me backed up into a corner." Appellant testified that he asked the question because he "want[ed] an attorney at that point." He testified further that SA Scroggins responded to his question by suggesting that

I better get an attorney, a damn good one, because he was gonna get up on the stand and tell the court that I had broke—busted into [Airman G's] room, threw her on the bed, ripped her clothes off and raped her and then I just left, and that they was gonna believe him over me because I had already given a couple of statements to the effect of that.

SA Scroggins disputed appellant's testimony on this latter point. He testified that, after appellant requested counsel at the end of the interview, he advised appellant that "the area defense counsel here was a very good attorney; if he would go be completely honest with the area defense counsel he could probably help him in this situation."

According to appellant, SA Flick then asked if he "wanted an attorney at that time," and appellant asked "if I would be able to talk to them again after I had talked to an attorney, to get that story straightened out, and he said no." SA Flick testified that he told appellant that if he wanted a lawyer "the interview would have to be stopped."

SA Scroggins testified that appellant asked "whether or not he could continue talking about some specific issues that had occurred in the room, and I told him it would not be up to me at that point; if he requested counsel he would need to discuss that matter with his counsel, and if they desired further testing we could certainly continue."

Defense counsel argued to the military judge that the agents chilled appellant's exercise of his right to counsel by telling him that, if he wanted counsel, he would need a "damn good one" because SA Scroggins would testify in court that he was "a dirty liar," but if appellant told "them what they want[ed] to hear," they would help him. De-

fense counsel argued that the agents were not clarifying appellant's remarks, but were trying to persuade him to forego his right to counsel.

The military judge denied the motion to suppress appellant's statements and made the following findings of fact and conclusions of law: (1) that on both December 2 and December 10, 1990, appellant was "clearly and unequivocally advised of his rights"; (2) that on both dates appellant "clearly and unequivocally said he understood his rights and said that he did not want the services of an attorney"; (3) that during the interview on December 10, appellant asked, "Can I still have a lawyer or has this gone beyond that?"; (4) that appellant was "then again, clearly and unequivocally, advised of his rights and again, clearly and unequivocally, declined to ask for an attorney"; and (5) that at about 3:50 p.m. on December 10, appellant "asked for an attorney" as his "written statement was being prepared," and that the interview was terminated by the OSI agents at that time.

Appellant now argues before this Court that his question, "Can I still have a lawyer or has this gone beyond that?" was an inarticulate but unequivocal request for counsel. He further argues that his purported waiver of his rights was a product of "the coercive and misleading atmosphere" in which he was questioned. Final Brief at 9–10. The Government argues that appellant's question falls short of even an equivocal request for counsel and that it was nothing more than a request for clarification of his right to counsel. Answer at 7.

*Discussion*

An accused in custody, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him," unless he validly waives his earlier request for the assistance of counsel. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981). "[W]hen counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." *Minnick v. Mississippi*, 498 U.S. 146, 153, 111 S.Ct. 486, 491, 112 L.Ed.2d 489 (1990).

Mil.R.Evid. 305(d)(1), Manual for Courts-Martial, United States, 1984, codifies the Constitutional right to counsel. It provides in pertinent part that an accused or suspect "is entitled to consult with counsel ..., to have such counsel present at the interrogation, and to be warned of these rights ... if—(A) ... the accused or suspect is in custody, could reasonably believe himself or herself to be in custody, or is otherwise deprived of his or her freedom of action in any significant way." Mil.R.Evid. 305(d) is based on this Court's decision in *United States v. Tempia*, 16 USCMA 629, 37 CMR 249 (1967). Drafters' Analysis of RCM 305(d), Manual, *supra* at A22–14. In *Tempia* this Court held, "The test to be applied is not whether the accused, technically, has been taken into custody, but, absent that, whether he has been 'otherwise deprived of his freedom of action in any significant way.'" 16 USCMA at 636, 37 CMR at 256. Where an accused or suspect has been ordered to report and submit to questioning, his interrogation will be regarded as "custodial interrogation." *Id.*

■ If a request for counsel is ambiguous, investigators may clarify appellant's request before continuing the interrogation. *Davis v. United States,* —— U.S. ——, ——, 114 S.Ct. 2350, 2356, 129 L.Ed.2d 362 (1994).

■■ Waiver of the rights against self-incrimination and to counsel are not valid unless they are made "freely, knowingly, and intelligently." RCM 305(g)(1). The Government must prove voluntariness by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972). In determining whether a waiver is valid, an appellate court must look to the totality of the circumstances. *Fare v. Michael C.*, 442 U.S. 707, 724–25, 99 S.Ct. 2560, 2571–72, 61 L.Ed.2d 197 (1979); *United States v. Lonetree*, 35 MJ 396, 400 (CMA 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1813, 123 L.Ed.2d 444 (1993). *See* 2 S. Childress & M. Davis, *Federal Standards of*

*Review* (hereafter Childress & Davis) § 11.13 at 11–53 (2d ed.1992).

■ An admonition to tell the truth does not ordinarily render a subsequent statement inadmissible. *United States v. Barfield*, 507 F.2d 53 (5th Cir.), *cert. denied*, 421 U.S. 950, 95 S.Ct. 1684, 44 L.Ed.2d 105 (1975). Likewise, advising a suspect of the adverse legal repercussions of a false statement does not necessarily render a subsequent statement inadmissible. *Rivers v. United States*, 400 F.2d 935 (5th Cir.1968). Finally, a "truthful and noncoercive statement of the possible penalties" for an offense under investigation may be given without rendering a subsequent statement inadmissible. *United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978).

Where there are underlying factual issues requiring resolution of conflicting testimony, the military judge's findings of fact will be upheld "if fairly supported in the record"; but the question whether, "under the totality of the circumstances, the confession was obtained in a manner consistent with the Constitution," is a question of law, to be reviewed *de novo*. *Miller v. Fenton*, 474 U.S. 104, 117, 106 S.Ct. 445, 453, 88 L.Ed.2d 405 (1985); 2 Childress and Davis, *supra*, § 11.13 at 11–57 and 11–58.

### Conclusions

In this case the question whether appellant was in "custody" was not litigated. He reported to the OSI office unescorted and voluntarily submitted to a polygraph examination. On the other hand, he had been apprehended and interrogated on December 2 and had been summoned to the OSI office for further questioning on December 10. The OSI, as well as the parties to the trial, proceeded as though appellant's interrogation on December 10 was "custodial." *See United States v. Kendig*, 36 MJ 291, 295 (CMA 1993); *United States v. Sager*, 36 MJ 137, 145 (CMA 1992). Accordingly, we will decide this case on that basis.

■ We hold that appellant's question regarding counsel constituted an equivocal request for counsel. Accordingly, it was permissible for the OSI agents to ask questions to clarify whether he was invoking his right to counsel. *Davis v. United States*, —— U.S. at ——, ——, 114 S.Ct. at 2356, 2357.

■■ With respect to appellant's testimony that he was coerced and threatened during the interrogation, we hold that the military judge's finding of a "clear and unequivocal" waiver of rights after the colloquy about a belated request for counsel is supported by the record. SA Scroggins' admonition not to sign the written statement unless it was completely truthful and his suggestion that appellant had lied were not improper or unduly coercive. Even if SA Scroggins threatened to tell a court-martial that appellant had lied and gave appellant misleading advice about the maximum punishment for rape, his actions do not invalidate appellant's waiver of his right to counsel. At the time these various comments were made appellant had already unequivocally waived his rights, made a written statement on December 3, made a second handwritten statement on December 10, had voluntarily taken a polygraph examination, and was voluntarily discussing the incident.

If SA Flick's recall of the sequence of events is correct, SA Scroggins' comments occurred "well after" appellant's ambiguous question about his right to counsel had been clarified and he had "clearly and unequivocally" waived his right to counsel. To the extent that SA Scroggins' remarks may have intimidated appellant, they frightened him only into reconsidering his waiver and eventually unequivocally invoking his right to counsel.

If, as SA Scroggins indicated with considerable uncertainty, his remarks occurred prior to appellant's question about counsel, they merely coerced appellant to ask the question. After appellant asked his question, he was again advised of his rights, and the military judge found that he had "clearly and unequivocally" waived them. That appellant understood and was willing to exercise his rights was demonstrated when he terminated the interview by requesting counsel. Accordingly, we hold that the military judge did not err by denying the motion to suppress.

*Decision*

The decision of the United States Air Force Court of Military Review is affirmed.

Judges COX, CRAWFORD, and WISS concur.

SULLIVAN, Chief Judge (dissenting):

Appellant contends that the coercive conduct of the police investigator occurred during the clarification questioning. In *Nash v. Estelle*, 597 F.2d 513, 517–18, *cert. denied*, 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409 (1979), the Fifth Circuit said:

This is not to say that an interrogating officer may utilize the guise of clarification as a subterfuge for coercion or intimidation. As the Supreme Court reiterated in *Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977), in examining an alleged waiver of the right to counsel "courts indulge in every reasonable presumption against waiver." *Miranda* [*v. Arizona*] stated that a suspect may waive effectuation of his rights but only if "the waiver is made voluntarily, knowingly and intelligently." 384 U.S. [436] at 444, 86 S.Ct. [1602] at 1612 [16 L.Ed.2d 694]. The critical factor is whether a review of the whole event discloses that the interviewing agent has impinged on the exercise of the suspect's continuing option to cut off the interview.

Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting.

*Michigan v. Mosley*, 423 U.S. [96,] 103[–04], 96 S.Ct. 321, 326, 46 L.Ed.2d 313 [ (1975) ]. *See also North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).

The findings of the military judge and the Court of Military Review do not address this question.

I also do not agree that any error that may exist in this regard is logically harmless. Appellate defense counsel asserts:

Appellant believes the record shows at least that it was only after the violation of his rights that the agents got appellant to admit that 1) A1C [G] never told him that she wanted to have sex with appellant, 2) he had sex with her anyway, 3) he continued to have sex with A1C [G] even after she told him to stop, 4) he did some things that night (covering her mouth or forcing her head) that might have made A1C [G] think he was forcing her to have sex with him, 5) he did rape A1C [G] that night, 6) he knew she was passed out or unconscious in her room at the time he went up there, and 7) he put his hand over her mouth to keep her quiet. R. 313–16, 322–23, 389.

Final Brief at 13–14.

I think a remand is in order. *See United States v. Davis*, 36 MJ 337 (CMA 1993), *aff'd*, —— U.S. ——, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); *United States v. DuBay*, 17 USCMA 147, 37 CMR 411 (1967).