Judge STUCKY delivered the opinion of the Court.
We granted review to determine whether jurisdiction existed pursuant to Article 2, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 802 (2006), to try Appellant in a court-martial, despite an order from a California court that established a limited conser- *467 vatorship over Appellant. We hold that jurisdiction existed pursuant to Article 2(e).[1]
I.
In accordance with Appellant’s pleas, a general court-martial by military judge alone found Appellant guilty of two specifications of being absent without leave, four specifications of possessing child pornography, and fraudulent enlistment in violation of Articles 83, 86, and 134, UCMJ, 10 U.S.C. §§ 883, 886, 934 (2006). Appellant was sentenced to a bad-conduct discharge, confinement for four years, and forfeiture of all pay and allowances. The convening authority approved the sentence but suspended all confinement in excess of twelve months for twelve months in accordance with the pretrial agreement. The United States Navy-Marine Corps Court of Criminal Appeals (CCA) affirmed. United States v. Fry, NMCCA 201000179, 2011 CCA LEXIS 5, at *14-*15, 2011 WL 240809, at *5 (N.-M.Ct.Crim.App. Jan. 27, 2011) (unpublished).
A.
Appellant was sixteen years old and living in California when he met Gunnery Sergeant (GySgt) Matthew Tesón, a Marine Corps recruiter, at a Young Marine function. When Appellant became an appropriate age for recruitment, GySgt Tesón contacted Appellant. Appellant, however, was unavailable for enlistment because he was leaving the recruiting district for a school in Colorado for adolescents with psychiatric, emotional, or behavioral problems.
Before Appellant left for Colorado, his grandmother petitioned a California state court to establish a limited conservatorship over Appellant, because Appellant had autism,[2] had been arrested for stealing and carrying a “dirk or dagger,” and was alleged to be unable to provide for his needs for health, food, clothing, or shelter. The petition further alleged that Appellant could not “control his impulsivity.”[3] Based on these allegations, the California court, after an uncontested hearing, entered an order that both restricted Appellant’s ability to, and gave Appellant’s grandmother the power to choose a residence, access confidential papers and records, contract, have the exclusive right to give or withhold medical treatment, and make all decisions concerning Appellant’s education.
B.
When Appellant was approximately twenty years old, he returned from the Colorado school still subject to the limited conservator-ship. Shortly after returning, he contacted GySgt Tesón about enlisting in the Marines. After passing the Armed Services Vocational Aptitude Battery (ASVAB), certifying that he understood the terms of his enlistment, and obtaining his birth certificate and social security card from his grandmother, Appellant undertook the obligations, duties, and training of a Marine and, in turn, received pay and allowances. Appellant initially had issues in basic training: he stole peanut butter and hid it in his sock; he urinated in his canteen; he refused to eat; and he failed to shave and then lied about it.
During these struggles, Appellant visited the medical staff and informed the medical officer that he was autistic and an asthmatic. When Appellant’s limited conservator was called and asked about the autism diagnosis, she acknowledged that Appellant was autistic. A medical officer informed the limited conservator that Appellant would be sent home. However, Appellant remained, because he indicated that he was motivated and desired to return to training and was found medically fit to do so.
After the incident in medical, Appellant returned to training and completed initial drill, first phase, the initial physical fitness *468 test, second phase, rifle qualification, the series commander interview, final drill, and the Crucible[4] without a recorded incident. The limited conservator not only voiced no explicit objection to Appellant’s becoming a Marine, she also attended Appellant’s graduation ceremony. Appellant committed his offenses approximately two to three months after being assigned to routine duty while waiting to attend infantry school. Appellant objected at trial that the court-martial lacked personal jurisdiction over him.
II.
“Perhaps no relation between the Government and a citizen is more distinctively federal in character than that between it and members of its armed forces.” United States v. Standard Oil Co., 332 U.S. 301, 305, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947), result superseded by statute, Medical Care Recovery Act, Pub.L. No. 87-693, § 1, 76 Stat. 593 (1962). For this reason, “the scope, nature, legal incidents and consequences of the relation between persons in service and the Government are fundamentally derived from federal sources and governed by federal authority.” Id. at 305-06, 67 S.Ct. 1604 (citing Tarble’s Case, 80 U.S. 397 (13 Wall. 397), 20 L.Ed. 597 (1872); Kurtz v. Moffitt, 115 U.S. 487, 6 S.Ct. 148, 29 L.Ed. 458 (1885)). Federal law, not state law, is the benchmark by which courts measure whether a person is subject to court-martial jurisdiction. See United States v. Blanton, 7 C.M.A. 664, 665-66, 23 C.M.R. 128, 129-30 (1957).
Appellant, however, asserts that his situation is different. He claims that the decision of the California court as to his capacity to contract is binding on courts-martial under the federal full faith and credit statute, 28 U.S.C. § 1738 (2006). This statute, which dates to 1790, states that authenticated state judicial proceedings are entitled to the same full faith and credit in “every court within the United States” as they have in the courts of their own state.
We have our doubts that the full faith and credit statute was ever intended to import state statutory or case law into an enlistment contract, which is governed by federal law. Standard Oil, 332 U.S. at 305, 67 S.Ct. 1604; Lonchyna v. Brown, 491 F.Supp. 1352, 1353 n. 1 (N.D.Ill.1980); Colden v. Asmus, 322 F.Supp. 1163, 1164 (S.D.Cal.1971). In considering the issue, however, we remain mindful of the Supreme Court’s warning that “[c]ourts should think carefully before expending ‘scarce judicial resources’ to resolve difficult and novel questions of constitutional or statutory interpretation that will ‘have no effect on the outcome of the case.’” Ashcroft v. al-Kidd, — U.S. -, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011) (quoting Pearson v. Callahan, 555 U.S. 223, 236-37, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). Here, determining whether court-martial jurisdiction existed pursuant to Article 2(b)[5] would require determination of important issues of federalism and comity, which are unnecessary since Article 2(c) offers an alternative means of resolving this case.[6]
III.
Article 2(e) provides that:
Notwithstanding any other provision of law, a person serving with an armed force who—
(1) submitted voluntarily to military authority;
(2) met the mental competency and minimum age qualifications of sections 504 and *469 505 of this title at the time of voluntary submission to military authority;
(3) received military pay or allowances; and
(4) performed military duties;
is subject to this chapter until such person’s active service has been terminated in accordance with law or regulations promulgated by the Secretary concerned.
Article 2(c), UCMJ (emphasis added).
Courts have generally recognized that the “notwithstanding” language is a clear statement of law indicating the obvious intent of the drafters to supersede all other laws. See Cisneros v. Alpine Ridge Group, 508 U.S. 10, 18, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993) (citing a number of circuit court opinions). The practical effect of the “notwithstanding” clause is that courts-martial need not concern themselves with the legal effect of other “clause[s] in ... statute[s], contracts], or other legal instruments],” when deciding whether they have jurisdiction. Black’s Law Dictionary 1345 (9th ed. 2009) (defining “provision”).
Congress has the power to override state law that would interfere with the ser-vicemember-military relationship, given its distinctively federal character. See Standard Oil Co., 332 U.S. at 305, 67 S.Ct. 1604; cf. Herrera-Inirio v. I.N.S., 208 F.3d 299, 307-08 (1st Cir.2000) (holding, in the realm of immigration, that when Congress possesses plenary authority over the subject matter at issue, “it may freely displace or preempt state laws in respect to such matters”) (citations omitted). Thus, in assessing whether the accused in this ease met the mental competency requirements for jurisdiction pursuant to Article 2(c), the military judge was not bound by the California order, even assuming it was directly on point. The military judge was only required to review the relevant evidence, including the order, to determine whether the requirements of Article 2(c) were met.
IV.
A.
Our most recent and expansive discussion of Article 2(c) is United States v. Phillips, 58 M.J. 217 (C.A.A.F.2003), in which we held that Article 2(c) sets out a three-part analytical framework for finding jurisdiction. Id. at 220. The threshold question is whether the person is “ ‘serving with an armed force.’ ” Id. If that can be established, the analysis proceeds to the four-part test laid out in Article 2(c), which requires findings that the accused: voluntarily submitted to military authority; met the mental and age requirements of 10 U.S.C. §§ 504 and 505; received military pay or allowances; and performed military duties. Phillips, 58 M.J. at 220. If all four parts of the test are met, then the person is subject to court-martial jurisdiction, until the person is released pursuant to law or regulation. Id. The only seriously contested issue here is whether Appellant was mentally competent, within the meaning of the statute.[7]
Contrary to the dissent’s suggestion, we recognize that voluntariness is a separate and distinct requirement under Article 2(c) and that it retains its usual meaning. Black’s Law Dictionary, supra, at 1710-11 (“voluntary” is defined as “[d]one by design or intention” or “[u]nconstrained by interference; not impelled by outside influence”). Furthermore, voluntariness remains a question evaluated under the traditional rubric of looking at the totality of the relevant circumstances, including the individual’s mental state. Cf. Brady v. United States, 397 U.S. 742, 749, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970).
*470 Evidence either that Appellant’s actions were compelled by an outside influence, like duress or coercion, or that Appellant could not understand the nature or significance of his actions might be reasons to find that Appellant has not acted voluntarily. There is no evidence of duress or coercion in this case. Thus, we are left only to consider whether Appellant understood the nature or significance of his actions.
This question necessarily requires courts to consider Appellant’s mental capacity, which inevitably overlaps with the mental capacity determination in Article 2(c)(2). If Appellant had mental capacity under Article 2(c)(2), then it is surely evidence that he had the requisite mental capacity to understand the significance of submitting to military authorities, i.e., it would tend to show that he acted voluntarily in that regard.[8] Thus, we turn our attention to the question of mental competency.
B.
“ ‘When an accused contests personal jurisdiction on appeal, we review that question of law de novo, accepting the military judge’s findings of historical facts unless they are clearly erroneous or unsupported in the record.’” United States v. Hart, 66 M.J. 273, 276 (C.A.A.F.2008) (quoting United States v. Melanson, 53 M.J. 1, 2 (C.A.A.F.2000)). Whether Appellant is mentally competent is a question of fact, and we will only set aside findings of fact if they are clearly erroneous. Cf. United States v. Barreto, 57 M.J. 127, 130 (C.A.A.F.2002) (concerning mental competency to stand trial (quoting United States v. Proctor, 37 M.J. 330, 336 (C.M.A.1993))).
Section 504 sets out the standard in relevant part as “[n]o person who is insane ... may be enlisted in any armed force.” 10 U.S.C. § 504(a). The general definition section states that “the word[ ] ‘insane’ ... shall include every idiot, lunatic, insane person, and person non compos mentis." 1 U.S.C. § 1 (2006) (emphasis added). Non compos mentis requires something more than merely suffering from a mental disease; the concept envisions someone that is “ ‘incapable of handling her own affairs or unable to function in society.’” Perry v. United States Dep’t of State, 669 F.Supp.2d 60, 66 (D.D.C.2009) (quoting Smith-Haynie v. Dist. Of Columbia, 155 F.3d 575, 580 (D.C.Cir.1998)); see also Webster’s Third New International Dictionary 1536 (1986) (defining non compos mentis as “wholly lacking mental capacity to understand the nature, consequences, and effect of a situation or transaction”).
The clear purpose of § 504 was to codify something approximating the common law concept of capacity to contract, in that only those people may enlist who have the ability to understand what it means to enlist. See S.Rep. No. 96-197, at 122 (1979), reprinted in 1979 U.S.C.C.A.N. 1818, 1827 (noting that the new subsection (b) overrules United States v. Russo, 1 M.J. 134 (C.M.A.1975) “by reaffirming the law as set forth by the Supreme Court in In re Grimley, 137 U.S. 147, 11 S.Ct. 54”); In Re Grimley, 137 U.S. 147, 150, 11 S.Ct. 54, 34 L.Ed. 636 (1890) (noting that enlistment creates a “contractual relation between the parties; and the law of contracts ... is worthy of notice”); id. at 152-53, 11 S.Ct. 54 (“Of course these considerations may not apply where there is insanity, idiocy, infancy, or any other disability which, in its nature, disables a party from changing his status or entering into new relations.”).
Given that the concept codified in § 504 is akin to capacity to contract, those events that occurred before and after enlistment are relevant to determining the person’s mental condition on the date the enlistment was executed. Cf. Knott v. Pervere, *471 285 F.Supp. 274, 278 (D.Mass.1968) (interpreting California law). Furthermore, “the weight of authority seems to hold that mental capacity to contract depends upon whether the allegedly disabled person possessed sufficient reason to enable him to understand the nature and effect of the act in issue. Even average intelligence is not essential to a valid bargain.” Cundick v. Broadbent, 383 F.2d 157, 160 (10th Cir.1967).
V.
The military judge concluded that jurisdiction existed pursuant to Article 2(c), and he specifically found Appellant mentally competent. In particular, the military judge concluded that Appellant had “the capacity to understand the significance of his enlistment.” Our review is limited to determining whether that conclusion was clearly erroneous. We find that it was not.
The Government called Dr. Bruce T. Reed to testify about Appellant’s mental capacity. Dr. Reed had participated on Appellant’s Rule for Courts-Martial (R.C.M.) 706 board that occurred prior to trial. In that role, he had personally interviewed Appellant and reviewed his medical records. The results of the board were that Appellant was able to appreciate the nature and quality of the wrongfulness of his conduct and that Appellant had sufficient capacity to stand trial and cooperate in his defense. In response to a question about whether Appellant understood the significance of his enlistment, Dr. Reed testified a “partial yes.” When specifically asked if he would find that Appellant understood the significance of his enlistment by a preponderance of the evidence, he testified that “when you ask me 51 percent or more, I would have to say yes.”
In contrast, the defense presented an affidavit from a psychologist, Dr. Julie E. Schuck, which stated in relevant part, “based upon my over ten years of clinical evaluation of [Appellant], do I believe that [Appellant] had the mental capacity to understand the significance of his enlistment in the military. My answer is no.” That opinion was based on Dr. Schuck’s belief that Appellant’s decision to enlist was “driven by his long-term perseveration with being in the military ... and the impulsive decision to do something without remotely considering the long-term consequences and his limitations_ [Appellant] pursued this plan based solely on desire and gratification, without critical analysis and reasoning.”
When faced with conflicting evidence on whether a party is competent, the military judge does not err merely because some evidence points in the opposite direction of the military judge’s ultimate conclusion. See United States v. Morgan, 40 M.J. 389, 394 (C.M.A.1994) (‘Where there are underlying factual issues requiring resolution of conflicting testimony, the military judge’s findings of fact will be upheld ‘if fairly supported in the record’ ....”) (citations omitted); In Re Rains, 428 F.3d 893, 902 (9th Cir.2005) (“In the face of conflicting testimony, the bankruptcy court did not clearly err in discounting the theoretical speculation of Rains’s experts, or in finding that Rains was mentally competent to enter into the settlement agreement.”). Even though the military judge did not specifically cite either expert witness’s testimony in his written findings or analysis, he acknowledged that Appellant had been diagnosed “ ‘as suffering from obsessive compulsive symptoms ... and [that Appellant] cannot control his impulsivity,’ ” which were conclusions generally presented by Dr. Schuck’s affidavit and other evidence presented by defense counsel.
The military judge concluded, however, that the surrounding circumstances did not sufficiently support the claim of impulsivity, assuming impulsivity alone would be enough to invalidate a contract, because “the accused largely (and ultimately) managed to conform his conduct to the requirements of the law (and orders and directives) throughout recruit training ....” The military judge also relied on the fact that Appellant passed the ASVAB and that Appellant overcame his initial struggles and successfully completed training without further negative reviews, which tended to show that Appellant could and did understand the need to conform his conduct to the standard set out for all Marines.
*472 In regard to the California court order, the military judge found that “[i]n toto, the evidence indicates that the probate court’s findings, while not perfunctory, provide little support for a presumption, much less a finding, that for the purposes of Article 2, UCMJ, the accused did not have the capacity to understand the significance of his enlistment.” This conclusion makes sense in the context of California law, that “[t]he conser-vatee of the limited conservator shall not be presumed to be incompetent _” Cal. Prob.Code § 1801(d) (West 2011).[9]
Admittedly, the military judge may have overstated matters when he claimed that “all of the evidence” pointed in one direction. But when reviewed as a whole, the military judge’s ruling indicates that he considered contrary evidence and ultimately found in the face of conflicting views that the evidence better supported a finding that Appellant was mentally competent and acted voluntarily. The military judge’s findings that Appellant met the requirements for jurisdiction under Article 2(c) are fairly supported by the record and, thus, are not clearly erroneous.
VI.
The judgment of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.

.Oral argument in this case was heard at the Global Reach Conference Planning Center, Scott Air Force Base, Illinois, as part of the Court's "Project Outreach.” See United States v. Mahoney, 58 M.J. 346, 347 n. 1 (C.A.A.F.2003). This practice was developed as part of a public awareness program to demonstrate the operation of a federal court of appeals and the militaiy justice system.

. Evidence in the record indicated that Appellant has a high functioning variety of autism.

. One doctor diagnosed Appellant with an “impulse disorder, NOS [not otherwise specified]." Although the opinion may discuss Appellant’s condition in other words, it is in light of this diagnosis.

. The Crucible is a fifty-four-hour test of a Marine recruit's skills that emphasizes teamwork, perseverance, and courage. It is the final test before a recruit becomes a Marine. The Crucible: The Recruits’ Final Test, United States Marine Corps, http:/lwww,mannes.comlmain/index/ making-marines/recruit-training/training-matrix/ the-crucible (last visited Jan. 25, 2012).

. Article 2(b) provides that "[t]he voluntary enlistment of any person who has the capacity to understand the significance of enlisting in the armed forces shall be valid for purposes of jurisdiction under subsection (a) and a change of status from civilian to member of the armed forces shall be effective upon the taking of the oath of enlistment.”

.See generally the strictures on constitutional adjudication enunciated in Justice Brandéis' famous concurrence in Ashwander v. TVA, 297 U.S. 288, 341, 56 S.Ct. 466, 80 L.Ed. 688 (1936).

. Everyone, at all relevant times, acted as though Appellant was a validly enlisted, active duly member of the armed services. He was performing routine duties, in uniform, on a regular basis when he committed his offenses; thus, Appellant was serving with the armed forces. Appellant has not argued that he was drunk or under duress when he attempted to enlist or continued to serve; as such, there is no basis to question the voluntariness of Appellant’s actions. It is also beyond dispute that Appellant was old enough to enlist. He received pay and allowance and, as noted above, performed routine duties. Finally, there is no evidence that Appellant was or has been released from service.

. While we sympathize with the dissent that mental disability encompasses a broad spectrum of conditions, and we recognize that Appellant might not have been an ideal candidate for military service, we, nevertheless, are tasked with determining whether Appellant can be held criminally liable after purportedly becoming a member of the armed forces. Even though an accused’s location on the spectrum of mental disabilities may influence the result, whether the accused can be held criminally liable is a yes or no proposition, in that the accused either met the requirements for jurisdiction or he did not.

. The military judge also found that the limited conservator did not object to Appellant’s enlistment, although she did voice her reservations and hostility to the idea. Although this conclusion is supported by the record, it is not an essential finding, since courts-martial are not bound by orders like the one in issue when determining whether the requirements of Article 2(c) are met.