*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
DALY, GROSS, and de GROOT
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Nathan M. RIVERA**
Private First Class (E-2),
U.S. Marine Corps
*Appellant*

**No. 202400304**

_____

Decided: 13 November 2025

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Adam J. Workman

Sentence adjudged 3 February 2024 by a general court-martial convened at Marine Corps Base Camp Lejeune, North Carolina, consisting of members with enlisted representation, with sentencing by military judge alone. Sentence in the Entry of Judgment: confinement for 48 months, reduction to pay grade E-1, and a dishonorable discharge.[1]

---

[1] Appellant was credited with 7 days of confinement credit. The military judge also awarded 240 days of credit for restriction tantamount to confinement. *See United States v. Mason*, 19 M.J. 274 (C.M.A. 1985).

For Appellant:
*Captain Arthur L. Gaston III, JAGC, USN*

For Appellee:
*Lieutenant Commander Philip J. Corrigan, JAGC, USN* (argued)
*Lieutenant Erin H. Bourneuf, JAGC, USN* (on brief)
*Lieutenant Lan T. Nguyen, JAGC, USN* (on brief)

Senior Judge GROSS delivered the opinion of the Court in which Chief Judge DALY and Judge de GROOT joined.

———————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

———————————————

GROSS, Senior Judge:

Appellant seeks reversal of his convictions for one specification of violation of Article 112a, Uniform Code of Military Justice (UCMJ) and one specification of violation of Article 120, UCMJ,[2] on the basis that the military judge improperly denied his motion to suppress statements given to law enforcement. Central to this appeal is Appellant's claim that agents of the Naval Criminal Investigative Service (NCIS) misled him when advising him of his rights under the Fifth Amendment and Article 31(b), UCMJ.[3] Because we hold that the military judge did not abuse his discretion in finding that Appellant's waiver of his rights to remain silent and to counsel was knowing, intelligent, and voluntary, we affirm the findings and the sentence.

---

[2] 10 U.S.C. §§ 912a, 920.

[3] Although Appellant's brief seeks reversal of all of the findings and sentence, counsel for Appellant conceded at oral argument that Appellant's guilty plea to the Article 112a charge and specification waived his claim for error with respect to that charge and specification. We agree, and summarily affirm those findings.

## I. BACKGROUND

Appellant attended a party at the home of Sergeant (Sgt) Lima on 14 October 2022 in base housing located on Marine Corps Base Camp Lejeune.[4] Appellant was friends with Sgt Lima's roommate at the time, Corporal Bravo. Corporal Bravo was friends with another partygoer, Navy Hospital Corpsman Third Class (HM3) Charlie.[5]

Most of the partygoers engaged in heavy drinking. Corporal Bravo testified that he had more than 5 drinks, and HM3 Charlie testified that she had about 16 shots of hard liquor. Appellant was also drinking alcohol and had taken two "tabs" of LSD at around 2100 prior to attending the party. During the party, Cpl Bravo became sick due to intoxication and threw up. Petty Officer Charlie helped Cpl Bravo to bed, gave him some food and water, and left him a trash bag to vomit into. She then returned to the living room and eventually was there only with Sgt Lima and Appellant.

The three sat on the couch in the living room and watched a movie together. During the movie, Appellant tried to get closer to HM3 Charlie, and she became uncomfortable with his attempts. She then left the living room and went to lie down in the room with Cpl Bravo. She chose to lie on the floor next to Cpl Bravo's bed.

Petty Officer Charlie woke to a "stabbing" sensation in her anus and realized that she was being penetrated by Appellant's penis. She resisted by trying to push him off and wriggling. She testified that Appellant's penis eventually slipped out of her anus, and he then penetrated her vulva with his penis without her consent. As Appellant was penetrating her vagina, HM3 Charlie began screaming for Cpl Bravo, but Cpl Bravo did not wake up or respond. When the assault ended, HM3 Charlie finally was able to shake Cpl Bravo awake. She then left the house and went to the naval hospital where she underwent a Sexual Assault Forensic Examination (SAFE). The nurse examiner noted findings consistent with sexual activity and took swabs of HM3 Charlie's genitalia that were sent to the U.S. Army Criminal Investigation Laboratory (USACIL) and indicated the presence of Appellant's DNA and semen in HM3 Charlie's vagina.

The same day HM3 Charlie reported the sexual assault to the naval hospital, NCIS special agents (SAs) were notified of the allegations against Appellant. Appellant was woken up by his superior and driven to the NCIS field office where SA Foxtrot interrogated Appellant. Prior to the interrogation, SA

---

[4] All names contained within this opinion other than those of Appellant, counsel, and military judges, are pseudonyms.

[5] By the time of trial, Cpl Bravo and HM3 Charlie were married.

Foxtrot told Appellant that he thought Appellant had a "a pretty good idea of why" he was talking with NCIS SAs. Special Agent Foxtrot also said that he felt that it was important to give Appellant the opportunity to tell the agents what had happened. He further told Appellant that it would be up to Appellant's commanding officer to decide what to do with the investigation, and then said, "I have found that commanding officers are not lenient, but they are more understanding when they've got the full picture of what happened."[6] He continued, saying,

> I want to stress to you . . . [it] is super important that we get your side of the story, okay? I want to have a conversation with you about last night, but before we do that, I'm going to read you your rights to let you know that you don't have to talk to me. You can get a lawyer.[7]

Special Agent Foxtrot then continued telling Appellant that he felt it was really important to hear from Appellant, but reminded him several times that it was "only if you want to talk to us." Special Agent Foxtrot then proceeded to provide Appellant with a form that listed his rights under Article 31(b), UCMJ. The form stated, in relevant part, that Appellant had been advised by SA Foxtrot that he was suspected of sexual assault in violation of Article 120, UCMJ, and that: (1) Appellant had the right to remain silent; (2) any statement Appellant made could be used against him in a trial by court-martial; (3) Appellant had the right to consult a lawyer prior to questioning – this lawyer could be a civilian lawyer retained by Appellant or a military lawyer appointed at no cost to Appellant; (4) Appellant could have a lawyer present during the interview; and (5) Appellant could terminate the interview at any time.[8]

Special Agent Foxtrot asked Appellant, "Do you understand all of these? All these rights one through five?" to which Appellant responded, "I'm a little iffy on three."[9] Special Agent Foxtrot responded,

> Three? Okay, so you have the right to consult a lawyer prior to any questioning where it could be a lawyer retained by you at no cost to the United States, a military lawyer appointed to act as your counsel at no cost to you or both. Okay. So what that means is before we talk, you've got the right to go consult with a lawyer or have them present during this questioning. However, it's not

---

[6] App. Ex. LI at 5.

[7] App. Ex. LI at 6.

[8] App. Ex. XLIX at 3.

[9] App. Ex. LI at 6.

like the shows like—SVU or you know whatever it is where
they're like call your lawyer and have them come. If you—if you
lawyer (sic), we—we basically won't have a conversation with
you. We don't get to hear your side of this story, okay? And we'll
just go with what we've got. So, you've got that right. You can
have them present. But we just—that's not something we do.
We—it's not like the shows where we call somebody and the guy
comes and we get in here with a little briefcase and slam it on
the thing and he says 'we're done here,' you know what I mean?[10]

Appellant responded simply, "Yeah" and SA Foxtrot continued, "That's not,
that's not what happens. But that's—that's one of your rights. Do you under-
stand what that means?" Appellant nodded and then ultimately agreed to
waive his rights and speak with law enforcement.[11] During the course of his
interview with SA Foxtrot, Appellant initially disclaimed having a detailed
memory of the night, but eventually admitted to remembering going into Cpl
Bravo's room and trying to wake Cpl Bravo. He admitted that when Cpl Bravo
did not wake up, he penetrated HM3 Charlie's vagina with his penis while he
believed she was asleep.

Prior to trial, Appellant filed a motion to suppress his statements to SA
Foxtrot. As an enclosure to his motion, Appellant signed an affidavit in which
he stated that SA Foxtrot's "explanation" with regard to his right to counsel

led me to believe that I did not have a right to have a lawyer
present during the interview because that right does not apply
to NCIS or me as a Marine. Because of [SA Foxtrot's] explana-
tion, I believed the right to consult with an attorney before ques-
tioning and the right to have an attorney present during ques-
tioning only applies to civilian law enforcement, not NCIS be-
cause it's not "what we do."[12]

The military judge heard evidence, including the testimony of SA Foxtrot
on the motion to suppress. Although the Defense did submit Appellant's affi-
davit, Appellant did not testify at the hearing, despite his right to do so for the
limited purpose of the suppression motion pursuant to Military Rule of Evi-
dence 304(f)(3). The military judge also watched the video of Appellant's con-
fession. During the hearing, SA Foxtrot testified that he was not trying to con-
fuse Appellant and that what he intended to convey by the language quoted

---

[10] App. Ex. LI at 6.

[11] App. Ex. LI at 6-7.

[12] App. Ex. XLIX.

above was that the logistics of obtaining an attorney was not like what is portrayed on television.

After hearing argument, the military judge issued a 17-page ruling denying Appellant's motion to suppress. In his ruling, the military judge took into account the fact that Appellant was 22 years old at the time of the interrogation, had more than 2.5 years of service, had previously studied mechanical engineering in college, and was intelligent – having a GT score of 126 and an AFQT of 92/99.[13] The military judge also stated that

> Nothing the Agent told [Appellant] was factually untrue. It is a matter of common practice that if a subject invokes their right to counsel then NCIS will simply terminate the interview. SA [Foxtrot] did not tell him he did not have the right to have an attorney present, he simply told him that if he invoked that right it would be the end of the interview . . . . While SA [Foxtrot's] explanation was made in an attempt to persuade [Appellant] to waive his rights, it has long been held that ploys to mislead a suspect or lull him into a false sense of security do not render a statement involuntary provided they do not rise to the level of compulsion or coercion . . . . The Court does find that if SA [Foxtrot's] explanation of the right to an attorney was a factor in [Appellant's] decision to waive his rights, it was the product of his own balancing and competing considerations.[14]

Appellant subsequently pleaded guilty to one specification of use of LSD, and not guilty to three specifications of sexual assault – two for penetration of HM3 Charlie's anus with his penis and one for penetration of HM3 Charlie's vagina with his penis without her consent. After trial on the merits, the members convicted Appellant of penetrating HM3 Charlie's vagina with his penis, but acquitted him of the other two specifications. Appellant then elected sentencing by military judge alone, and the military judge sentenced him to confinement for 48 months, reduction to E-1, and a dishonorable discharge.

---

[13] App. Ex. LX at 14.

[14] App. Ex. LX at 15 (citing *Illinois v. Perkins*, 496 U.S. 292 (1990)).

## II. DISCUSSION

### A. The military judge did not abuse his discretion in denying Appellant's motion to suppress.

*1. Law*

We review the military judge's denial of a motion to suppress Appellant's statements for an abuse of discretion.[15] "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion."[16] A military judge abuses his discretion when he: (1) "predicates a ruling on findings of fact that are not supported by the evidence of record," (2) "uses incorrect legal principles," (3) "applies correct legal principles to the facts in a way that is clearly unreasonable," or (4) "fails to consider important facts."[17] We will not disturb the military judge's findings of fact in ruling on a motion to suppress unless those findings are clearly erroneous.[18]

In the military, investigators must inform suspects of their rights prior to questioning them. These rights are set forth in two sources. First are the constitutional rights recognized in the Fifth Amendment to the Constitution as set forth by the Supreme Court in *Miranda v. Arizona.*[19] Second are the statutory rights as set forth in Article 31(b), UCMJ. "The Fifth Amendment right to counsel applies only during custodial interrogations."[20] "Article 31(b) is a statutory precursor to *Miranda* warnings that implements the Article 31(a) privilege against compulsory self-incrimination."[21]

"A confession is involuntary, and thus inadmissible, if it was obtained 'in violation of the self-incrimination privilege or due process clause of the Fifth Amendment to the Constitution of the United States, Article 31, or through

---

[15] *United States v. Chatfield*, 67 M.J. 432, 437 (C.A.A.F. 2009) (citing *United States v. Pipkin*, 58 M.J. 358, 360 (C.A.A.F. 2003)).

[16] *United States v. Jones*, 73 M.J. 357, 360 (C.A.A.F. 2014) (quoting *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000).

[17] *United States v. Rudometkin*, 82 M.J. 396, 401 (C.A.A.F. 2022) (citations omitted).

[18] *Chatfield*, 67 M.J. at 437.

[19] 384 U.S. 436 (1966); *see United States v. Tempia*, 16 C.M.A. 629, 37 C.M.R. 249 (1967) (applying *Miranda* warning requirements to custodial interrogations in the military).

[20] *United States v. Flanner*, 85 M.J. 163, 169-70 (C.A.A.F. 2024).

[21] *United States v. Evans*, 75 M.J. 302, 304-05 (C.A.A.F. 2016).

the use of coercion, unlawful influence, or unlawful inducement.'"[22] When a suspect unambiguously invokes his or her rights under *Miranda* or Article 31(b), law enforcement officials may not conduct any further questioning of the suspect about the offense unless they do so in a manner demonstrating that they have scrupulously honored the suspect's invocation of rights.[23]

In ruling on a motion to suppress, "whether a petitioner made a knowing and voluntary waiver of his *Miranda* rights is a separate inquiry from a voluntariness claim."[24] In our review of the military judge's rulings, we may consider not only the reasons given by the military judge, but also other legal bases upon which the action of the military judge is defensible.[25]

We have previously held that an investigator's statements may invalidate a rights advisement when the investigator lies to an accused about the nature of the rights warning. In *United States v. Patterson*, we stated "While an investigator need not use the 'precision and expertise of an attorney in informing an accused of the nature of the accusation,' he may not mislead the person by informing him he is not accused of criminal conduct when the opposite is true."[26]

Waiver of the rights to remain silent and to counsel are not valid unless they are made freely, knowingly, and intelligently.[27] The analysis a court must undertake in determining whether a waiver of rights was knowing, intelligent, and voluntary is based on the totality of the circumstances.[28] In considering the totality of the circumstances, courts have historically considered an accused's "age, experience, education, background, and intelligence and [his] ca-

---

[22] *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008) (quoting Mil. R. Evid. 304).

[23] *United States v. Delarosa*, 67 M.J. 318, 320 (C.A.A.F. 2009).

[24] *Etherly v. Davis*, 619 F.3d 654, 662 (7th Cir. 2010) (*citing Edwards v. Arizona*, 451 U.S. 477, 484, (1981)), *cert.* denied, 562 U.S. 1257 (2011) .

[25] *See United States v. Bess*, 80 M.J. 1, 11-12 (C.A.A.F. 2020).

[26] No. 202200262, 2024 CCA LEXIS 130, at *13 (N-M. Ct. Crim. App. Apr. 4, 2024) (quoting *U.S. v. Simpson*, 54 M.J. 281, 284 (C.A.A.F. 2000)).

[27] Military Rule of Evidence 305(e)(1).

[28] *United States v. Morgan*, 40 M.J. 389, 393 (C.M.A. 1994).

pacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights."[29] None of these factors alone is controlling.

*2. Analysis*

We begin by noting that the Government here concedes that Appellant was in custody at the time of his interrogation. While we are not bound by the Government's concessions in every case, here we will treat the Government's concession and the military judge's finding that Appellant was subjected to a custodial interrogation as the law of the case.[30] As a result, SA Foxtrot was required, under *Miranda* and *Tempia*, not only to advise Appellant of his rights under Article 31(b), but also to advise him of his right to counsel.[31]

Having found that Appellant had a right to counsel, we nevertheless find that the military judge did not abuse his discretion in admitting Appellant's statements. Appellant levels two primary attacks against the military judge's ruling, which we address in turn. First, Appellant claims that the military judge abused his discretion in finding that SA Foxtrot's statements to Appellant were "true." Second, Appellant claims that the military judge's ruling was based on a misstatement of the law when the military judge said that "ploys to mislead a suspect or lull him into a false sense of security do not render a statement involuntary" in analyzing SA Foxtrot's rights advisement.

Central to Appellant's arguments is his claim that SA Foxtrot's statements misled Appellant into believing the rights to consult with counsel, or have counsel present during questioning, did not apply to him as a Marine. We reject this argument, as did the military judge. The military judge had before him the video of Appellant's interrogation, the testimony of SA Foxtrot, and Appellant's affidavit. He was also presented with Appellant's age, education, military experience, and test scores.

While SA Foxtrot's explanation to Appellant was certainly not the model of clarity, what is clear from the video is that SA Foxtrot told Appellant several times that Appellant had both the right to remain silent and the right to counsel. Appellant's claim in his affidavit that he believed that the right to consult with counsel before questioning, or to have counsel present during questioning,

---

[29] *United States v. Mott*, 72 M.J. 319, 330 (C.A.A.F. 2013) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).

[30] *See United States v. Parker*, 62 M.J. 459, 464 (C.A.A.F. 2006) ("When a party does not appeal a ruling, the ruling of the lower court normally becomes the law of the case.").

[31] *See Flanner*, 85 M.J. at 169.

did not apply to him is simply unbelievable based on the totality of the circumstances of the rights advisement. SA Foxtrot informed Appellant six times of his right to consult with counsel prior to and during questioning. At no time did SA Foxtrot say that the right did not apply to Appellant specifically or Marines generally.

We find, as did the military judge, that SA Foxtrot's message during his "SVU" speech was focused on the logistics involved if Appellant wanted to speak with a lawyer or be represented during questioning. This is supported by SA Foxtrot's statement that "it's not like the shows where *we call somebody* and the guy comes."[32] Furthermore, the military judge's finding that "It is a matter of common practice that if a subject invokes their right to counsel then NCIS will simply terminate the interview" is not clearly erroneous—it is the law. When a suspect invokes his right to counsel, law enforcement may not conduct any further interrogation without first scrupulously honoring the suspect's invocation. In most cases, this means that the interview ends.

This case is readily distinguishable from *United States v. Patterson.* In *Patterson*, we set aside the findings and sentence after the agent actively and deliberately sought to minimize the Article 31(b) rights.[33] There, the agent told First Lieutenant (1stLt) Patterson that the rights advisement form was "just a piece of paper," created a false distinction between the words "accused" and "suspected[,]" and falsely told 1stLt Patterson, "I don't want you to think we are accusing you of anything."[34] Furthermore, *Patterson* involved not only outright misstatements by investigators but also other coercive factors not at play in this case, including an order from 1stLt Patterson's executive officer not to "squirrel around" with the investigators and the investigators' repeated references to 1stLt Patterson's commanding officer.

Here, SA Foxtrot told Appellant multiple times that he had the right to consult with counsel and to have counsel present. Even after telling Appellant that the interrogation was not like "SVU," SA Foxtrot still reiterated that Appellant had those rights: "But that's -- that's one of your rights."[35] Appellant then acknowledged his rights and still agreed to speak with the SAs. Appellant does not suggest, and there is no evidence in the record to show, that anyone in Appellant's chain of command directed him in any way as to how to interact with the NCIS SAs.

---

[32] App. Ex. LI at 5 (emphasis added).

[33] 2024 CCA LEXIS 130.

[34] *Id.* at *13.

[35] App. Ex. LI at 6.

The military judge also found that Appellant "was not objectively misinformed about his right to counsel." We agree. Although Appellant claimed in an untestable affidavit that he did not understand that he could speak to a lawyer before or during questioning, this claim was unreasonable. Appellant was told both in writing and verbally by the SA that he could do exactly that. Special Agent Foxtrot's statement that "that's not something that we do" is properly understood to be that NCIS agents would not call a lawyer for Appellant. Appellant's responses indicated that he understood this. Rather than inquiring as to the apparent dichotomy, which Appellant now asks us to find SA Foxtrot created, Appellant paused, considered his rights, and agreed to waive them. This is bolstered by the fact that Appellant is well educated and intelligent, with more than two years of experience in the military prior to the interrogation. The military judge's findings of fact that rejected Appellant's claims were not clearly erroneous.

We likewise find that the military judge's ruling was not based upon an incorrect view of the law. Appellant points to the military judge's statement that interrogators may use ploys to mislead a suspect as evidence that the military judge wrongly conflated what investigators may do post rights advisement with what is required during the advisement phase. While the military judge's unnecessary citation to *Illinois v. Perkins*[36] is, again, not the model of clarity, the entirety of the military judge's ruling shows that he used the proper legal principles in evaluating the Defense motion and the evidence.

The military judge properly stated that in order to knowingly and intelligently waive his rights, a suspect must have "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."[37] In light of our review of the military judge's ruling, we do not find that the military judge relied upon an erroneous view of the law. While the military judge's discussion about the permissibility of investigator's use of "ploys to mislead a suspect" is inapplicable in the rights advisement context, it is clear that he used the proper framework and determined that Appellant's waiver was knowing, intelligent, and voluntary—and therefore not the result of Appellant being tricked into believing that the rights to counsel did not apply to him.

Finally, we are convinced that even if the military judge did hold an erroneous view of the law based on the idea that an investigator may lie to an accused during the rights advisement, we find that this view did not influence the military judge's decision. This is because, again, the military judge affirm-

---

[36] Note 14, *supra.*

[37] App. Ex. LX at 10.

atively found that SA Foxtrot did not lie to Appellant and that Appellant understood his rights. We therefore hold that we can affirm the military judge even if he held an incorrect view of the law because Appellant properly understood his rights to counsel and validly waived them.[38]

## III. CONCLUSION

After careful consideration of the record, the briefs, and oral argument of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[39] The findings and sentence are **AFFIRMED.**

FOR THE COURT:

MARK K. JAMISON
Clerk of Court

---

[38] *See Bess*, 80 M.J. at 11-12.

[39] Articles 59 & 66, UCMJ, 10 U.S.C. §§ 859, 866.